### DAVID KIMBALL *vs.* EDWARD F. CUSHMAN.

The fact that a person, who, being in charge of a horse with the assent of its owner and engaged on his business, caused an injury by negligent riding, was in the general employment of a third person, does not exempt the owner of the horse from liability for the injury, unless the relation of the third person to the business was such as to give him exclusive control of the means and manner of its accomplishment, and exclusive direction of the persons employed therefor.

TORT for injuries alleged to have been caused to the plaintiff by the defendant through his servant Charles H. Flanders in negligently riding a horse against the plaintiff on a highway in Haverhill. The answer, among other grounds of defence, denied that Charles H. Flanders was the defendant's servant or agent at the time of the accident.

At the trial in the superior court, before *Scudder*, J., the plaintiff introduced evidence tending to show that, about five o'clock n the afternoon of April 8, 1868, Charles H. Flanders was riding at an immoderate speed a horse (which it was admitted was one of a span belonging to the defendant) on the highway in question, when he came into collision with the plaintiff, who was crossing the highway on foot; that the alleged injuries were the

result of the collision ; and that the collision was caused by the rapid riding of Charles H. Flanders.

" It appeared that the defendant came to Haverhill in November 1867, with his wife and child, and boarded with his father in law, Joseph Flanders, who was the father of Charles H. Flanders ; that he brought his carriage and this span of horses; and that a stable was built, about that time, on the premises of Joseph Flanders.

" The plaintiff was allowed to prove, under the objection of the defendant, that, from November 1867 until after the accident, Charles cleaned the defendant's carriage and harnesses and kept them in order, and took care of these horses at the stable, and fed, watered and groomed them ; that he frequently drove them, sometimes alone, and sometimes with the defendant or the defendant's wife or other members of the family ; that the hay and grain for the horses were ordered sometimes by the defendant himself, and sometimes by Charles, and the bills were paid by the defendant ; that on the morning of April 8, 1868, Charles ordered a bundle of hay for the horses, which was afterwards paid for by the defendant; and that Charles brought the horses to the blacksmith to be shod, and the defendant paid the bills.

" John Griffin also testified that in June 1868 he overheard a conversation between the defendant and Henry Phelps, in which the defendant asked Phelps if he knew of any one whom he could get to take care of his horses, and Phelps said he did not, when the defendant said he wanted to get somebody because he was away a good deal and Charley was off a good deal of the time when he wanted him. It also appeared that the defendant was a trader in Boston, and was not in Haverhill much of the time except at night and on Sundays.

" This was all the evidence offered by the plaintiff to prove that Charles was the agent or servant of the defendant, and the defendant asked the judge to rule that it was insufficient, but as the defendant did not propose to rest upon the plaintiff's case, the judge declined so to rule.

" Upon the question whether Charles was his agent or servant, the defendant testified that, when he came to Haverhill, he

agreed with Joseph Flanders, that Flanders should build a stable for him and he would pay rent for it, and that Flanders should take care of his horses, he furnishing hay and grain and Flanders doing all the work; that he did not suppose that Flanders would take care of the horses personally, and expected that Charles would do it, though nothing was said specifically about that; that no price was agreed upon at the time, nor was anything paid by him until they settled in November 1868, when he paid Flanders five dollars a week for the care of the horses, and fifty dollars for the rent of the stable for a year. He further said that he never hired or in any way employed Charles to do anything for him. At the time of the accident he was away in Canada and had been absent several weeks.

" Joseph Flanders testified that the defendant employed him to take care of his horses; that no specific bargain was made; that the defendant was to find hay and grain, and he was to take care of the horses; that Charles was employed by him, and was not at the time of the accident in the employ of the defendant; and that he paid Charles for his service by supplying him with his living. On being asked by the defendant if he had any agreement with the defendant in relation to taking care of his horses, and if any, what it was, after some hesitation he replied that he received the pay for taking care of them; that he settled with the defendant in November 1868, and received five dollars a week for taking care of said horses; that no price had been agreed upon prior to that settlement; that he was the depot master at Haverhill for the Boston and Maine Railroad; that Charles was twenty-seven years old, had been in no particular business for some years, was with the defendant at Brookline prior to his coming to Haverhill, and since that time had lived with the witness, sometimes assisting him in his official duties, for which he (the witness) received pay, and sometimes rendering other service to the railroad for which he was placed upon the pay roll and received the pay himself; that if the defendant had paid Charles he should not have claimed it or found fault with it.

" Charles H. Flanders testified that he was never employed by the defendant in regard to these horses, but did all that he did to or for them as the servant of his father, with whom he lived ; that he frequently drove all the members of the family with the defendant's assent; that he had no particular talk with his father about taking care of these horses, and knew of no agreement between the defendant and his father; that he only knew that he had taken care of the horses and had received no pay for it, but his father had. He also testified that, on the morning of the day of the accident he had ordered a bundle of hay for the horses, which was afterwards paid for by the defendant; and that, in the afternoon of said day, finding the hay had not come, his father told him he had better go and hurry it up, as there was none left, and suggested his taking a horse for that purpose; that he mounted the horse, and had started to go after the hay when he met the team with the bundle of hay on it; that he then thought he would go to the post-office and see if there were any letters in his father's box; that he went there and looked into the office, and, seeing the box empty, started to return, and while riding back came into collision with the plaintiff. On cross-examination he said that the defendant's wife as well as the rest of the family sometimes had letters in that box, and that he should have taken letters for her if there had been any, as was his custom.

" This was all the testimony offered by the defendant on this part of the case. The only evidence in reply was that of the plaintiff himself, who testified that Charles told him, after the accident, that he took care of the defendant's horses, but that there was no particular agreement about it; and of another witness, who testified that Charles told him that at the time of the accident he had been down to see why the bundle of hay ordered by him that morning had not arrived, and, finding that it had been sent, he went back in a hurry for fear that the teamster would leave it in the wrong place.

" The defendant requested the judge to instruct the jury that, upon the whole evidence, they would not be authorized to find that Charles was the agent or servant of the defendant, so that he would be liable in this action for any negligence which caused

this injury. But the judge refused so to rule, and submitted the case to the jury with instructions to which no other exception was taken. The verdict was for the plaintiff, and the defendant alleged exceptions."

*S. B. Ives, Jr., & S. Lincoln, Jr.,* for the defendant.

*H. Carter,* for the plaintiff.

WELLS, J. There was some evidence, competent to be submitted to the jury, and from which they might infer that, in the care and exercising of the horse, and in the main purpose for which he was out with the horse on the occasion in question, Charles H. Flanders was the servant of the defendant. It is not necessary that he should be shown to have been in the general employment of the defendant, nor that he should be under any special engagement of service to him, or entitled to receive compensation from him directly. It is enough that, at the time of the accident, he was in charge of the defendant's property by his assent and authority, engaged in his business, and, in respect to that property and business, under his control. *Wood v. Cobb,* 13 Allen, 58. The fact that there is an intermediate party, in whose general employment the person, whose acts are in question, is engaged, does not prevent the principal from being held liable for the negligent conduct of the subagent or underservant, unless the relation of such intermediate party to the subject matter of the business in which the underservant is engaged, be such as to give him exclusive control of the means and manner of its accomplishment, and exclusive direction of the persons employed therefor.

In this case, there was no contract with Joseph Flanders such as would exclude the defendant from control of and responsibility for the acts of Charles H. Flanders in the service upon which the latter was engaged; and we think it was rightly left to the jury to determine, upon all the evidence in the case, whether there was such control and responsibility; that is, whether, on the occasion in question, Charles was acting as the servant of the defendant, in his business and with his assent and authority. The jury having, under proper instructions, found that he was so, their verdict must stand.

*Exceptions overruled.*