## YELLOWAY, Inc., v. HAWKINS.
### No. 8693.

Circuit Court of Appeals, Eighth Circuit.
Feb. 17, 1930.

MUNGER, District Judge, dissenting.

Paul M. Peterson, of Columbia, Mo. (Boyle G. Clark and Harry T. Limerick, Jr., both of Columbia, Mo., on the brief), for appellant.

Franklin E. Reagan, of Columbia, Mo. (Ruby M. Hulen, of Columbia, Mo., on the brief), for appellee.

Before VAN VALKENBURGH and GARDNER, Circuit Judges, and MUNGER, District Judge.

VAN VALKENBURGH, Circuit Judge.

July 20, 1927, Yelloway, Incorporated, a Colorado corporation, together with Western Auto Travel Agency, Incorporated, also a Colorado corporation, entered into a contract with one Carl Schack. Inasmuch as the construction of this contract has an important bearing upon the issues here presented, it is advisable, if not necessary, that it be quoted in full.

"This agreement, made and entered into this 20th day of July, A. D. 1927, by and between the Western Auto Travel Agency, Inc., and Yelloway, Inc., both Colorado corporations, parties of the first part, and Carl Schack, party of the second part.

"Witnesseth:

"That whereas the parties of the first part are engaged in the business of securing passengers for automobile owners, bus operators and private and common carriers between the several principal cities of America, and in such other business is more specifically set forth in their Articles of Incorporation filed in the office of the Secretary of State of Colorado, and

"Whereas, for such purposes first parties maintain offices in Denver, Kansas City, Los Angeles and elsewhere, and have expended large sums of money in advertising a route of transportation between various cities in the United States, and have in their opinion sufficient volume established to warrant the operation of additional busses between Kansas City and St. Louis and/or St. Louis and Chicago and/or Chicago and Detroit.

"And Whereas, the party of the second part is about to purchase motor bus equipment more specifically described as follows:

"1 6 A. L. 29-passenger bus to cost not less than $11,500.00, and desires to avail himself of the services of the parties of the first part in obtaining passengers, conducting depots, advertising the said business, etc.,

"Now, therefore, for and in consideration of the sum of Ten Dollars and other good, valuable and sufficient consideration in hand paid by the parties of the first part to the party of the second part, receipt of which is hereby confessed and acknowledged, it is agreed by and between the parties hereto as follows:

"1. Parties of the first part agree to maintain suitable depots, offices and agencies in Kansas City, St. Louis, Chicago and Detroit, or to arrange with other transportation companies for the use of their depots in said cities.

"2. Parties of the first part agree to advertise the bus equipment of the party of the second part, its hours of departure for the given destinations, its accommodations, etc., to sell tickets, to disseminate information and circulars, printed matter advertising said bus line, and parties of the first part agree to defray the expense of same.

"3. Parties of the first part agree to allot to party of the second part a schedule of departure from the terminals of the run, and agree that no transportation will be sold for any other equipment on such schedule, unless there shall be an excess of equipment at one of the terminals, until such time all seats have been sold for the equipment of the

party of the second part, and to operate no equipment or sell tickets for any other equipment on such schedule except for overflow business after capacity of the bus equipment of the party of the second part has been sold for such schedule; provided, however, that until such time as the parties of the first part shall allot such schedule to the party of the second part, party of the second part agrees that he will have said bus equipment available for any trip to which the parties of the first part shall assign them, and party of the second part agrees that they will make such trips as the parties of the first part shall elect. First parties reserve the right, however, to change or allot a different schedule at any time.

"4. First parties agree to pay and second party agrees to accept Five Dollars ($5.00) for each passenger transported by second party as a through passenger between either of the said cities, as long as the gross fare shall be Seven Dollars ($7.00) and two cents (.02) per mile less twenty per cent. (20%) for transportation of each passenger to intermediate points; provided however, that in the event the fare shall be less than Seven Dollars ($7.00), second party shall receive eighty per cent. (80%) of the gross fare collected.

"5. Second party agrees that he will place the said bus equipment upon the said run within thirty (30) days from the date hereof, and will thereafter provide either his own or other bus equipment for each schedule of departure from the given destinations, weather conditions or other act of God alone being the only conditions that shall vitiate this provision.

"6. Second party agrees to insure and keep insured the said bus equipment against fire, collision, property damage in an amount not less than One Thousand Dollars ($1,000.-00) for any one accident and public liability Ten Thousand Dollars ($10,000.00) per passenger or Fifty Thousand Dollars ($50,000.-00) per load for any one accident, or for such larger amounts as the parties of the first part and/or any state or regulatory body may require. Said policy shall protect all parties to this agreement, shall be secured before said bus equipment is placed on said run, and shall be in such insurance company as is acceptable to the parties of the first part.

"7. Party of the second part agrees to employ only capable and efficient drivers for said bus equipment who are acceptable to the parties of the first part, and to defray all expenses of salary for said drivers, to defray all expenses of upkeep, maintenance and fixed charges of gasoline, oil and repair bills on said equipment, together with all other operations expenses, and to maintain the said equipment in good mechanical condition and to keep the same in clean and presentable appearance.

"8. Party of the second part agrees to leave terminals on the schedules of departure at such hour as first parties or their agents designate and to make the run between the given destinations on such scheduled time as first parties shall from time to time designate, weather conditions permitting, and no act of God or other cause wholly beyond second party's control intervening.

"9. Party of the second part agrees that the said bus equipment shall be distinctively painted and lettered, at his own expense, in the manner that the parties of the first part shall designate; and in the event second parties shall for any reason cease operations under this contract, or at any time that parties of the first part shall direct, second party agrees that they will change or remove the painting or lettering on said bus equipment.

"10. This contract shall be construed as a lease on said equipment from second party to first parties with all rights or priority for use of the highway, and all rights of operation upon which a franchise might be applied for shall accrue to the parties of the first part.

"11. Second party agrees that he will carry no passengers except those who shall purchase tickets or contracts of transportation from the offices and through the agencies of first parties; agree to accept and transport all passengers to their destinations and agrees to save and hold first parties harmless by reason of any injury to passengers, delays in arrival at destinations, property damage, loss of baggage, and/or public liability.

"12. It is further understood and agreed by and between the parties hereto that in the event first parties deem it expedient and necessary to place additional, larger, more elaborate or more efficient or different equipment upon said route between the given destinations, or desire to purchase the same at a fair appraisal value thereof, and in no event exceeding second party's cost of same, and retain him insofar as he is capable of performing his duties as driver or other employe of the company, and that second party

is to receive as a bonus the difference between the said appraised value of the equipment and his purchase price of same in common stock of Yelloway, Inc., at the book value thereof.

"13. Second party agrees that in the event of any accident of whatever nature occurring in the operation of said bus, equipment, he will report, or cause to be reported, to the main office of the parties of the first part at Denver, Colorado, all the details thereof, together with the names and statements of witnesses of such accident, within twelve (12) hours thereafter.

"14. First parties agree to maintain offices and depots as in their opinion may be necessary, agree to advertise for and solicit passengers for the said run and to otherwise conduct the business to the best of their ability, giving to the second party their benefit on all club purchases of gasoline, tires, etc.

"15. Second party agrees to furnish transportation without charge for any officers or employes of first parties between the given destinations, and second party shall have the right to accord the same privilege to any of his officers or employes without first parties making any charge for services rendered; and second party agrees to recognize such annual or trip passes as the parties of the first part may from time to time issue.

"16. It is agreed that in the event the operations hereunder between points herein designated shall not prove profitable to the parties hereto, then the said equipment may be transferred to such other run as in the opinion of the parties of the first part will prove more profitable.

"17. First parties agree to hold over such passengers as in their opinion may seem practicable for loading of said vehicles and agree to accord the said vehicles the benefit of transfer passengers.

"18. In the event that by some legal action which is not contemplated at this time and which cannot be foreseen, it becomes necessary to discontinue the said Kansas City-St. Louis-Chicago or Chicago-Detroit run, first parties agree to forthwith place second party's equipment, subject to the terms and conditions hereof, upon such run or runs as may be available and as may in the opinion of both parties warrant the operation of said second party's equipment, one of said runs to be resumed by second party if and when it is legally possible to do so, in which event all the terms and conditions hereof shall apply.

"19. If, at any time, second party feels that the operation of said equipment between the aforesaid destinations is unwarranted, or in the event second party is financially unable to continue said operations, or if for any reason 'second party shall elect to discontinue operations as aforesaid, shall give first parties thirty (30) days notice in writing to that effect, whereupon the parties of the first part shall have the right, if they so desire, to buy second party's equipment at a fair appraised value thereof.

"20. It is further agreed by the parties hereto that this contract may be transferred from the first parties to such corporation or individual as will assume the obligations hereunder, and second party agrees to look to such assignee and its capital stock for satisfaction of the terms of this contract.

"21. It is agreed that the parties of the first part shall have the right to place advertising cards in said bus equipment, provided that the party of the second part shall receive therefor not less than ten cents (10c) per card per month for such advertising cards placed in said bus equipment.

"22. This contract shall remain in full force and effect for a period of two (2) years from the date hereof, unless sooner cancelled for breach. Second party agrees that during such period he will not enter into any like or competing form of business, either directly or indirectly, between any of the cities or towns covered by this contract, and in the event this contract is cancelled, terminated or become inoperative for any reason whatsoever, second party agrees not to enter into like or competing form of business between any of the cities or towns covered by this contract within six (6) years from the date hereof.

"23. It is understood and agreed by the terms 'bus' and 'busses' or the term 'equipment' wherever used herein, shall mean not only the bus equipment herein described, but also any and all other and further equipment at any time obtained by second party at first parties' request and used and operated by second party hereunder.

"24. Second party agrees that upon the signing of this agreement he will execute and deliver to parties of the first part a surety bond in the amount of Five Hundred Dollars ($500.00) with sureties to be approved by parties of the first part, to guarantee the faithful performance of this contract.

"25. Second party may transfer this contract to such other individual, partnership, or corporation, as may be acceptable to first parties; provided, however, that nothing in such assignment shall be construed to alter the terms of this contract or change the provision of paragraph Twenty-two (22) hereof.

"26. It is further agreed between the parties hereto that second party shall only employ such drivers as are acceptable to first parties, and shall discharge any driver that first parties designate by reason of slovenly appearance, careless or negligent driving, use of intoxicating liquors, or for the good of the service.

"27. Second party agrees that drivers shall always be in uniform; that they shall always be neat and in presentable condition, and second party further agrees to abide by and accept any reasonable rule and regulation for the conduct of first parties' business that shall better protect the interest of first parties or shall tend to afford the public a higher degree of safety. Second party further agrees that they will abide by each and every state and municipal regulation, pay all necessary licenses, and will further comply with any and all regulations promulgated by the insurance company for the safety of the company's patrons.

"In Witness Whereof, the parties hereunto have set their hands and seals the day and year first above written.

"Yelloway, Inc.,
            "By R. W. Taggart, President.
"The Western Auto Travel Agency, Inc.,
            "By R. W. Taggart, President.
            (Parties of the First Part.)
"Carl Schack,  [Seal]
            (Party of the Second Part.)"

January 3, 1928, in Boone county, Mo., on state highway No. 40, a 29-passenger Mack Six bus, the property of said Carl Schack, and operated under the terms of the foregoing contract, with one W. C. Shelton as driver, ran into a wagon being driven by appellee, as a result of which, one of appellee's horses was instantly killed, his wagon totally demolished, and appellee himself severely injured. Appellee brought suit against appellant in the circuit court of Boone county, Mo., alleging negligent operation of the bus on the part of appellant, and praying damages in the sum of $25,375. The case was removed to the District Court for the Western District of Missouri because of diversity of citizenship. Thereafter, appellee filed his first amended petition in which he made Schack also a defendant. Still

later a second amended petition was filed, to which appellant filed a separate answer denying the allegations in appellee's petition, and interposing a defense of contributory negligence. The case came on for trial before a jury, at which time appellee entered a dismissal as to the defendant Schack. The jury returned a verdict in favor of appellee, assessing his damages at the sum of $5,000. Judgment was entered accordingly and this appeal followed. At the close of the testimony, counsel for appellant requested the court to direct the jury to return a verdict for the defendant and to declare, as a matter of law, that the plaintiff was not entitled to recover damages under the pleadings and evidence. This request was refused and an exception preserved. Appellant assigns but two errors. The first, because of the refusal of the court to direct a verdict as requested. The ground relied upon, as stated in this assignment, was that, as contended by appellant, the bus at the time of the injury was not the property of the defendant, but was the property of Schack; that it was not under the control or management of Yelloway, Inc., but under that of Schack through the driver W. C. Shelton; that, therefore, appellant was not liable for the damages claimed.

The second assignment was that the court erred in permitting one Buescher, a chiropractor, to testify as to the nature and extent of appellee's injuries and to give an opinion as to the probable duration thereof, on the ground that the witness was not shown to be qualified to give such testimony as an expert.

With respect to this second assignment the record discloses that Dr. Buescher was a chiropractor, a graduate of a School of Chiropractic, and licensed to practice under the laws of the state of Missouri; that the special parts of the body with which the profession of chiropractic deals are the spinal column, spine, and the nerves. Four other physicians testified fully with respect to the injuries, their nature and probable duration. The testimony of Buescher was largely cumulative and was restricted substantially to the parts of the body with which his profession deals, and to the effect of injuries to such parts upon the general health of the injured person. We think the qualifications of the witness were sufficiently shown, and that his testimony did not exceed the limits of his professional knowledge as an expert.

The ground upon which a master is held liable for the negligent acts of his

servant is because the servant is engaged in the master's affairs, for the proper conduct of which the master is responsible. "The mere fact that a servant is sent to do work pointed out to him by a person who has made a bargain with his master does not make him that person's servant." Driscoll v. Towle, 181 Mass. 416, 63 N. E. 922.

The test is whether the servant is engaged in the work of the new master, who has particular "power to direct and control the manner of performing the very work in which the carelessness occurred." Charlock v. Freel, 125 N. Y. 357, 26 N. E. 262, 263; Atlantic Transport Co. v. Coneys (C. C. A. 2) 82 F. 177; Byrne v. Kansas City, Ft. S. & M. R. Co. (C. C. A. 6) 61 F. 605, 24 L. R. A. 693; Delory v. Blodgett, 185 Mass. 126, 69 N. E. 1078, 64 L. R. A. 114, 102 Am. St. Rep. 328; Johnson v. City of Boston, 118 Mass. 114; Kimball v. Cushman, 103 Mass. 194, 4 Am. Rep. 528; Grace & Hyde Co. v. Probst, 208 Ill. 147, 70 N. E. 12; Consolidated Fireworks Co. v. Koehl, 190 Ill. 145, 60 N. E. 87.

The decision of this court in Philadelphia & R. Coal & Iron Co. v. Barrie, 179 F. 50, 54, clearly states the applicable rule. In that case the defendant was a coal dealer. It hired from another dealer a team and a driver in the latter's general employ, for the purpose of delivering coal from its yards to its customers. The hirer paid a stipulated sum per hour for the services of team and driver and had full control and direction of the work and the method of its performance. The driver in that case not only received from the hirer direction from which of its yards the coal should be taken, the quantity and place of delivery, but also, upon arrival, unloaded the coal by shoveling it from the wagon into coal holes in the sidewalk, or otherwise placed it in the receptacle provided by the consumer. In short, the defendant company issued all orders to the driver in connection with the delivery of coal to purchasers in various parts of the city. The employment was of a continuous nature and involved the performance of every kind of service incidental to the delivery of coal in the business of the hirer. In doing this work, the driver apparently had left uncovered and unguarded a coal hole in the sidewalk through which he had been delivering coal. A customer of the store, to which the coal was being delivered, on leaving the store fell into this hole and was injured. Because of the negligence of the driver the Pennsylvania & R. Coal & Iron Company,

which had hired him, was held responsible. In his concurring opinion Judge Sanborn says:

"If, therefore, the proof in this case stopped with testimony that the Coal & Iron Company under its hiring had and exercised the power to direct the driver what amount of coal to take, and where and when to take and to deliver it, this evidence, in my opinion, would not have overcome the legal presumption that his general employer, Martin, was liable for his negligence in his method of doing his work, and that the Coal Company was free from liability. But the local manager of the Coal Company testified, regarding this driver and others, that these men were instructed to deliver the coal under the Coal Company's orders:

" 'Q. And the method of delivery is under your orders? A. Yes, sir. Q. Place, the time, the amount, and all, is under your orders? A. I have said so two or three times.'

"Because this testimony indicates that the control of the method of the performance of the work of protecting the coal hole while the driver was unloading the coal had been transferred by some agreement between his general employer and the Coal Company from the former to the latter, this case seems to me to be taken out from the general rule and presumption which have been stated."

See, also, Singer Manufacturing Co. v. Rahn, 132 U. S. 518, 10 S. Ct. 175, 33 L. Ed. 440.

In appellant's application to the Public Service Commission of the state of Missouri for a certificate of convenience and necessity, authorizing it to operate over the highways of the state between St. Louis and Kansas City, in its capacity as a motor carrier, it gave detailed information concerning the ownership and condition of the physical property used or to be used by it in the conduct of its business in the state of Missouri. We quote: "Leased Bus Equipment. This equipment is withdrawn from time to time from other Divisions of Yelloway, Inc., and used on this route. It is to be replaced by the new equipment on order: 1 29 passenger Mack Six, property of Carl Schack; 1 29 passenger Mack Six, property of A. L. Mulholland; 1 29 passenger Fageol and 1 29 passenger A. C. F., property of L. M. Schack."

The vehicle involved in this accident was the Schack 29 passenger Mack Six thus described. It will be noted that paragraph five of the contract contemplates the addition of

equipment, when needed, to that specially described. From the foregoing quotation it appears that, at the time this certificate was applied for, Schack had three busses employed in the service of appellant.

In general, by various paragraphs of the contract it was provided: That appellant was engaged in the business of a motor carrier over various routes, including that between St. Louis and Kansas City, Missouri; that it supplied the necessary equipment by means of contracts, which it construed as leases; that it reserved to itself and exercised absolute control over schedules and the designation of the points between which runs should be made, maintaining offices, agencies, and depots, for the sale of tickets and the accommodation of passengers, and officers to supervise and direct all operations of busses in its service. It has authority to transfer this equipment to such other run or runs as, in its opinion, will prove more profitable; and may discontinue routes when such action becomes necessary or desirable. All busses in its service are to be colored and lettered as it may designate, and, in fact, are so lettered and colored to indicate the operative control of Yelloway, Incorporated. Paragraphs seven and twenty-six of the contract give appellant practical control over the hiring and discharge of drivers, although this is not a decisive test of the point at issue. Standard Oil Co. v. Anderson, 212 U. S. 215, 225, 29 S. Ct. 252, 53 L. Ed. 480. The contract is to remain in force for a period of two years unless sooner canceled for breach. There is here presented no isolated case of the hiring of a public vehicle for purposes of hauling or carriage. The contract, in form, and in the nature of many of its provisions, is not a technical lease; but the parties have expressly stipulated that it should be so construed. And appellant reported the bus in question among others, to the Public Service Commission as "leased bus equipment." It is unnecessary, however, that the strict relationship of lessor and lessee should be held to exist. The contract, as a whole, discloses that appellant is engaged in the general business of a motor carrier for hire, and that the bus equipment employed is incorporated into that business, for the purposes of this litigation, as fully as though it were the absolute property of appellant. The oral testimony tends to confirm this conclusion. The witness Cook introduced by appellee testified as follows:

"Q. On the 3rd day of January, of last year, did you have any relations with the Yelloway, Incorporated, the defendant in this case? A. Yes, I was running the Missouri Transit Company at that time, and the Yelloway,—our busses was stopping at my garage, and the Yelloway made arrangements with us about three years before that to handle their tickets, our office to sell tickets for them, to make their office with our office.

"Q. So on the 3rd day of January you were maintaining an office for the Yelloway in Columbia? A. Yes, sir.

"Q. Was this accident or collision reported to you? A. Yes.

"Q. How did you receive the report? A. Somebody called up the office and said there was a Mr. Hawkins killed—I didn't know Mr. Hawkins, but they said somebody was wrecked out there and to send out some man.

"Q. Did you send out? A. Mr. Kelly was there, and I reported to him and Mr. Kelly went out.

"Q. Who was Mr. Kelly? A. He was a traffic manager for the Yelloway from Kansas City to St. Louis.

"Q. Just what are the duties of the road manager?

"Mr. Clark: I object to any testimony as to what Mr. Kelly did after the accident.

"Mr. Hulen: I am not asking what he did after the accident. I want to know who Mr. Kelly is and what his duties are.

"Mr. Clark: I object to that. If Mr. Cook knows independently of what Mr. Kelly told him.

"The Court: Temporarily the objection may be overruled.

"A. Mr. Kelly looked after the drivers; also checked the stations, and gave orders, issued tickets—in other words he was the same as a railroad traffic manager. * * *

"Q. Did you see this bus that struck Mr. Hawkins' wagon before the accident? A. Yes, sir.

"Q. Any name painted on that bus? A. Yelloway, Incorporated. I am not sure what division was on it. It was Yelloway, Incorporated painted on it, in the Yelloway colors.

"Q. Where did you see that bus? A. At my office.

"Q. Did the Yelloway stop there? A. All busses stopped there.

"Q. For what reason did this bus stop there? A. For orders I think. I think he and Kelly came in about the same time.

"Q. Did you see Mr. Kelly give him any orders? A. Yes.

"Q. What orders? A. St. Louis orders.

"Q. To report to St. Louis? A. Yes, sir.

"Q. How long was that before the accident? A. Possibly twenty or thirty minutes. * * * "

Cross-examination:

"Q. Now Mr. Cook, you say this bus had left your place of business that caused the accident? A. Yes, sir.

"Q. How long before? A. Twenty or thirty minutes.

"Q. Had no passengers on it? A. No, sir.

"Q. You say it had instructions to report to St. Louis? A. Yes, sir.

"Q. Driving empty to St. Louis so far as you know? A. Yes, sir."

The driver Shelton, a witness for appellant, on cross-examination testified:

"Q. You had the previous day come out of St. Louis with a load of passengers? A. Yes.

"Q. For the Yelloway, the defendant in this case? A. Yes.

"Q. Where were you taking these passengers? A. To Kansas City.

"Q. How far did you get with these passengers? A. Boonville.

"Q. That is twenty-five or thirty miles out of Columbia? A. Yes, sir.

"Q. You traveled No. 40 all the time? A. Yes, sir.

"Q. That is the one the Yelloway has the franchise on? A. Yes, sir.

"Q. When you got to Boonville you discharged your passengers? A. They would not let us go any further because of that five mile stretch of snow.

"Q. Who did you report the fact that you could not go further? A. The Yelloway, Incorporated, in St. Louis.

"Q. What did the Yelloway, Incorporated, of St. Louis tell you to do? A. He said to get them through to Kansas City as well as we could, by train, or if people wanted to stay there until they could get it cleared up he would stand the expenses.

"Q. Did you ask the manager at St. Louis what you should do? A. Yes, I asked him if I should turn around and go back to St. Louis, and he said no, to wait for further orders.

"Q. Did you wait for further orders? A. Yes, I waited for twelve hours for orders.

"Q. Who did you get the orders from? A. Mr. Kern.

"Q. What were those orders? A. For two busses to proceed to St. Louis and the others to proceed to Kansas City.

"Q. You were proceeding to St. Louis under the orders of the Yelloway, the defendant, when this accident happened? A. Yes, sir."

The contract with Schack bears date July 20, 1927. The accident occurred January 3, 1928. For nearly six months Schack's busses had been running in the service of appellant, the one in question regularly between St. Louis and Chicago, but transferred on this occasion, under the terms of the contract, to the route between St. Louis and Kansas City. At all times the busses, with their drivers, were engaged in the business of appellant and were under appellant's direction and control as to the manner and method of doing its work. The facts that, as stipulated, the bus broke down at a point near Columbia, Mo., that repairs were there made which were paid for by Schack, and that pursuant to appellant's orders, it was returning to St. Louis without passengers when the accident occurred, in nowise affects the conclusion we have reached that, at the time of the accident, the driver of the bus was the servant of appellant, and that the latter was liable for his negligent acts. It would be unfortunate if, by this device of operating by means of hired or leased equipment, appellant could escape responsibility for the negligent conduct of its business. We have preferred to consider this assigned error upon the merits. It is doubtful, however, whether the point is properly before us. The first assignment now under consideration is based expressly and solely upon the contention that the bus, at the time of the accident, was not under the control or management of appellant. The contention was not sharply called to the attention of the court and a ruling sought thereon. No request was made for an instruction to that effect. The court in its charge assumed that the driver of the bus was the servant of appellant. At the close of the charge, counsel for appellant not only took no exception thereto, but expressly announced that the defendant had no further request to make. Under these circumstances the law of the case was established, unless it clearly appears that the record wholly fails to disclose a cause of action. Schmidt v. Carpenter, 27 S. D. 412, 131 N. W. 723, Ann. Cas. 1913D, 296 and note; Union Pacific Ry. Co. v. James (C. C. A. 8) 56 F. 1001, 1006; 14 Ruling Case Law, par. 78, p. 822; Nichols & Shepard Co. v. Marshall, 28 S. D. 182, 132 N. W.

791; H. W. Ross Lumber Co. v. Building & Loan Ass'n, 51 S. D. 369, 213 N. W. 946.

We think the evidence amply justifies the charge of the court, and supports the verdict and judgment. It follows that that judgment should be, and is affirmed.

MUNGER, District Judge (dissenting).

Under the facts in this case, I think the appellant was not responsible for the act of the driver of the bus, because the driver was not subject to the direction or control of appellant in the mode of his performance of his work, and that the responsibility for the driver's act was imposed upon Schack as an independent contractor. Casement v. Brown, 148 U. S. 615, 13 S. Ct. 672, 37 L. Ed. 582; Byrne v. Kansas City, Ft. S. & M. R. Co. (C. C. A.) 61 F. 605, 24 L. R. A. 693; Bellatty v. Barrett Mfg. Co. (C. C. A.) 196 F. 493. The question was properly presented by a request at the close of the evidence, that the court should direct a verdict in favor of the defendant. I think that a new trial should be awarded, because of the error in overruling that request.