## STINNETT v. GULF, C. & S. F. RY. CO.
### No. 9519.

Court of Civil Appeals of Texas. Galveston.
Feb. 26, 1931.

Rehearing Denied March 19, 1931.

W. C. Carpenter, of Bay City, and Winbourn Pearce, of Temple, for appellant.

Styles & Erickson, of Bay City, and Terry, Cavin & Mills, of Galveston, for appellee.

GRAVES, J.

This general statement of the nature and result of the suit, deemed to be reasonably accurate in all material features as such, is taken from appellant's brief, after revision of the verbiage in a few unimportant particulars:

"Mrs. M. C. Stinnett, a widow, brought this suit against the Gulf, Colorado & Santa Fe Railway Company for damages resulting to her by reason of the death of her adult son, Bob Stinnett, alleging that his death was caused by Bob Stinnett's being struck by one of defendant's engines and trains, on or near the track of the defendant, at a public crossing constituted by an intersection of defendant's railroad and a public highway, just north of Bay City, Matagorda County, Texas.

"The plaintiff also alleged that, on the date in question, the deceased was on the public crossing, and was on or very near the track of the defendant, at such public crossing, and that he was in an intoxicated and helpless condition at the time he was so struck by defendant's engine and train; the plaintiff further alleging that the deceased was struck by a train going south, soon after midnight, and that for a long distance north of the crossing the track of the Railway Company was straight and level, and there was nothing to prevent the engineer and fireman on appellee's train from seeing the deceased for such long distance; the appellant also alleging that the death of the deceased was directly and proximately caused by the negligence and carelessness of the appellee, among other things, in failing and refusing to stop its train, and in failing and refusing to use all the means at hand to avoid injuring the deceased after having discovered his perilous position, and, further, in this connection, that the train was being run at a very moderate speed and could have been stopped within a few hundred feet, and that the perilous position of the deceased was discovered by both of the employees of the appellee, who were on the engine, in time to have avoided striking and killing the deceased, if such employees had used ordinary care in the use of all the means at hand, consistent with the safety of the train and those on same, and further alleged that the engineer and fireman, after discovering the perilous position of the deceased, failed to use all the means at hand, consistent with the safety of the train and those on same, to avoid striking and killing him; and the appellant further alleged that the deceased was an adult, ——— years of age, and that she was living with and dependent upon him for support, and that deceased would have been of great aid and benefit to her, and would have contributed to her support during the remainder of her life, and claimed and alleged damages in the sum of Twenty Thousand ($20,000.00) Dollars.

"The appellee answered by general denial and general and special exceptions, and, further, answered that the death of the deceased was proximately caused by the negligence and contributory negligence of the deceased, in various particulars.

"At the conclusion of the evidence of the appellant, the appellee filed a motion for an instructed verdict, and, over appellant's protest, the court granted the motion and gave the jury instruction to find a verdict for the appellee."

In due course verdict and judgment in accordance with the peremptory instruction followed, and this appeal therefrom has been regularly prosecuted.

The sole question the cause presents is: Did the evidence raise an issue of fact over whether or not appellant's son was killed at the alleged crossing by one of the appellee's south-bound trains as the proximate result of a negligent failure on the part of the operatives thereof to use the means at hand to

avoid injuring him, after having discovered him there in a position of peril?

If it did not, the judgment should be affirmed; otherwise a reversal must be ordered.

■ Under the now well-settled rule laid down by our Supreme Court in Wininger v. Ft. Worth & D. C. Railway Co., 105 Tex. 56, 143 S. W. 1150, that inquiry must be answered in the affirmative "if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff." See, also, Texas & P. R. Co. v. Cox, 145 U. S. 593, 12 S. Ct. 905, 36 L. Ed. 829; Brown v. Griffin, 71 Tex. 654, 9 S. W. 546; Texas & P. R. Co. v. Ball, 96 Tex. 622, 75 S. W. 4; International & G. N. Ry. Co. v. Tinon (Tex. Civ. App.) 117 S. W. 936.

■■■ It is true there is no direct testimony, either as to how the son met his death, or as to any negligent dereliction of the train operatives that may have proximately caused it, but that is not necessary; both features being susceptible of proof by circumstances alone. When those so abundantly present here are looked to and appraised in the light of the quoted test, it seems clear to this court that a jury might reasonably have found, not only that he was killed by the appellee's south-bound train at the particular crossing substantially as charged, but also that its operatives, the engineer and fireman, did see him in a perilous position either on, or so near the track as to amount to the same thing, in time to have stopped the train before it struck him.

It was indisputably shown that about daylight on July 16th of 1929 the dead body of Bob Stinnett, then cold and stiff, as if life had been extinct for possibly if not probably several hours, was found on the south part of that railroad crossing right by the track itself, his head being within four or six inches of the rail, the skull and face all crushed and caved in to the extent of one-half of the whole by wounds apparently caused by a driving force such as a heavy engine might inflict, the left arm extending full length along outside but near to the rail, with one finger and another piece of flesh from it off and lying inside the rail further toward the south, the body proper being stretched out at a slight angle toward the southwest, and the man's hat along with other effects witnesses swore were his, including a large bucket and a number of broken bottles they termed beer bottles, being strewn still further southward along the railroad track for several feet; that about 1 o'clock of the night before appellee's "sulphur extra" freight train passed to the south over that crossing, pulling 74 cars, 3 loaded and 71 empties; no testimony indicating the passage of any other train along there until

a portion of that same one was said by its conductor to have recrossed going back north some time after 4 o'clock the following morning.

These details affecting the scene of the tragedy, the position and condition of the body, a photograph of which as it lay when found being in evidence, were testified to by officials of the county, including the sheriff, justice of the peace, and health officer, after personal investigations they had made at the time; those as to the trains by the conductor of the "sulphur extra" referred to.

These excerpts indicate the minuteness of the sheriff's description:

"There were some signs on the rail, indicating the place where this finger was cut off; you could see where the finger had been cut from the mark on the rail; and right off below, where the finger was, a little piece that was busted off of this was lying on the inside, stuck to the rail. I mean that there was a little piece of flesh stuck to the rail, and just below that inside of the rail was the finger. This piece of flesh that was stuck to the rail showed to be a part that came off of the finger that was busted. There was a part of the finger that was off. The piece of flesh that was on the rail was south of the finger; the finger was between that and the hand, where the hand was lying; the piece of flesh was south of the finger, a little bit further south of the finger. The piece of flesh was just a little south of the finger. I didn't measure the distance between that piece of flesh and the finger, but I would say it was possibly some six or eight inches, something like that; they were just a small distance apart. On the track was the imprint of the bottom of the bucket, there in the roadway. That imprint of the bucket was a little bit north of the body; and there was glass; there was some glass there, strewed to the south of where this imprint was, and pieces of the bucket were picked up still further to the south, and the hat also."

"From the place where I saw the imprint of the bucket, the glass that was strewed all along to the south from there extended some eight or ten feet down the track that I noticed."

"Right where his hand was lying, there was marks right across there where his finger was cut off, it showed the mark there on the rail. By 'marks', I mean that there were blood stains there on the rail itself."

"That imprint of the bucket was in between the rails; and I would say that it was somewhere around four or five feet from the imprint of the bucket to the body of the deceased."

That of the justice of the peace was even more intimate and detailed. After saying that he had smelled beer all along the ground where the sheriff put the broken bottles, he

added that he had found eleven unbroken bottles of beer close to the deceased's car that had been left stuck in the mud near the crossing.

The witness O'Rear furnished direct testimony to his having been with Stinnett for more than twenty-four hours immediately prior to that and up to midnight, or a little later, of the night before the latter's body was so found at the railroad crossing; that during that period they had been drinking beer together, finally getting stuck in the mud near this crossing in Bob's car about dark on that night. He then adds: "I was at Bob's house that night in the car with him, when he left me in the car and went and got some beer in the house. * * * He brought some of the beer back to the car, where I was waiting for him, in a pasteboard carton and some in a water bucket, about a three gallon water bucket. That was just an ordinary zinc water bucket, of about three gallons capacity. The beer was bottled beer. Bob put some ice in the bucket with the beer—we had some ice in the car with us. * * * The last thing that I remember seeing Bob Stinnett do on the night in question was he got out of the car and went to the back of the car, and I heard the bucket move, the bucket we had in the car moved; that was the last thing I heard or saw of him; I laid down and went to sleep at that time, and I don't know what happened afterwards."

Surely from all this men of ordinary intelligence might reasonably draw the inference that such south-bound train, some time between midnight and daylight of July 16th, did at that crossing run over and kill Bob Stinnett while practically on the railroad track, either asleep or in a dazed condition from drink.

Equally persuasive seems the train of circumstances tending toward support of the negligence averment that one or both of the appellee's operatives, after seeing him so upon the track, failed to use the means at hand to avoid striking him; admittedly the engine's headlight was in good condition and shining brightly at the time, the track was level and straight for six miles, the train was equipped with Westinghouse airbrakes through which the air could have been applied to every one of its 74 cars at the same time, and both engineer and fireman were at the particular time sitting in their proper seats attending to their several duties in running the train and looking straight ahead for more than a mile as they approached the crossing, the train throughout that distance running not more than 25 miles per hour. It further uncontrovertedly appeared that the dirt at the crossing had been built up into a high road, and that the body of the deceased, who was quite a large man, lay head foremost toward the rail at the highest part of such road, and that the train at the speed it thus was making could have been stopped within 400 or 500 feet.

There was not only unanimity among all the witnesses as to there being no obstruction to the north that would have prevented the engineer and fireman as they approached from seeing the man reasonably shown to have been at the crossing in the attending circumstances stated, but the appellant's testimony further was to the effect that the sheriff and several other witnesses, after the tragedy, conducted an experiment looking to determining how far up the railroad track a man the size of Stinnett, and placed in the precise position he was in when found, could be seen under the headlight of an approaching train; that they selected a similar night to the one here involved, at a time when this same train, or one shown to be just like it, was passing; that the sheriff himself went up a telegraph pole some 40 feet from the track to about the same height the engineer would be sitting on his engine at a distance of 1,100 feet north of the crossing, and that he could plainly both see the body of the man he had so left at the crossing and recognize it as being a human form. Essentially the same testimony was given by the three other witnesses, except that two of them were on a pole on the opposite side of the railroad at a distance of about 600 feet, instead of 1,100.

To this was added the opinion of a former engineer, testifying as an expert, that an engineer on the train, sitting in his place and looking to the front, was in much better position to see objects on or near the track ahead of him than would be persons on an equal height with him, but away from the track.

While the engineer and fireman do not admit they saw the deceased, neither do they deny it; the most that appears with any bearing on that subject being the statement from the engineer alone—the fireman making none —that, on hearing the report of the happening next day, he at once examined the engine and found no sign that it had struck or come in contact with anything or anybody.

Aside from the consideration that appellant would have been entitled to a submission of the issue on proof reasonably tending to show failure on the part of either of them to meet the duty imposed upon both by the development of discovered peril, it would have made no difference in the rule of law appertaining to a situation of that sort under the conditions recited here, supra, had each positively denied that he did see the person in peril; the denial would not have been conclusive, the jury still having the right to weigh the denial against the circumstances tending the other way. Brown v. Griffin, 71 Tex. 654, 9 S. W. 546; Texas & P. Railway Co. v. Ball, 96 Tex. 622, 75 S. W. 4; Inter-

national & G. N. Railway Co. v. Tinon (Tex. Civ. App.) 117 S. W. 936.

In neither instance would the drawing of the inference herein alluded to amount to a building of one presumption upon another, as the appellee's brief contends, since there is neither dependence at all of one upon nor yet deduction of it from the other; each being a legitimate and independent conclusion from wholly detached and different facts and circumstances in evidence.

The other of appellee's objections, that the evidence did not tend to show by which train deceased was hit, whether by the south or north-bound one, if by either, has been fully answered by the preceding recital of many indicia that the south-bound train must have killed him.

Moreover, in mid July in the latitude of this event, daylight, the hour this body was first found, and some time after 4 o'clock the same morning, the time the north-bound train was said to have passed there, by common knowledge was so nearly synchronous as to have made it improbable that the body, during at most so brief an interval, could have become so cold and rigid as the sheriff testified he found it.

The evidence heard, without dispute, further tended to show that appellant was not only during his life dependent upon but also suffered damage as a result of the death of her son.

Further discussion is deemed unnecessary, since it follows from these conclusions that the case was not one for disposition by peremptory instruction. The judgment has accordingly been reversed, and the cause remanded for trial on the issues of fact herein pointed out.

Reversed and remanded.