## SOUTHERN STATES TRANSP. CO. v. FORD et al.

### No. 10298.

Court of Civil Appeals of Texas. Galveston.

Feb. 4, 1937.

Rehearing Denied Feb. 25, 1937.

Royston & Rayzor, of Galveston (Clarence Eastham, of Galveston, of counsel), for appellant.

Emmett F. Magee and Harris & Coltzer, all of Galveston, for appellees.

CODY, Justice.

The appellant complains that there was no evidence of any negligent act on its part, proximately causing the death of appellee's three year old child, to sustain the jury's verdict against it; and that, in any case, the findings of the jury on material special issues were so conflicting and contradictory that the verdict should have been set aside.

The controlling facts are: That appellee's child was a guest passenger in Wilmer Shakesneider's four-door, 1928 Chevrolet sedan, and was one of four other darkies rounded up by Shakesneider to run over with him from Galveston to Orange; this happened April 2, 1932; he caught the 7 p. m. ferry from Galveston to Bolivar, and parked his car about 14 feet from the back end of the ferry; about the time the car arrived on the Bolivar side, he started to crank his car by means of the crank, and as he started around to the door, the car began to reverse, backed off the ferry into the bay, drowning the four darkies that remained in the car. The cause of this appellee attributed to the negligence of appellant in several particulars, one being that the cable barrier in the rear was not properly connected with the eyebolt pin. This the jury found true, and a proximate cause of the child's death.

The evidence in the case was conflicting. Shakesneider testified that when he cranked his car the engine ran slowly, but he didn't have a chance to get into his car before it started reversing at a slow speed, and jerked a few times as if about to stop. No one was near him, he tried to hold the car and "hollered" for help, but received none. He held to the fender and was dragged overboard; he was unable to say if there were a cable on the after end of the ferry. He did not know why the car went into reverse; it was idling at first and then went into reverse. He could not get to the ignition to cut it off or to the steering wheel to turn the car into the barrier on the side of the ferry. A negro named Janie and the little negro, Napoleon, were on the front seat—not assisting in starting the car. It was in first-class mechanical condition, and brakes were in first-class shape, but he didn't know if they were set. When the car started backing and jerked at first he knew it was in gear. He never saw a cable back of him. There were two spare tires on the back of his car.

A witness that worked for appellant testified that the ferry was about 5 or 6 feet distant from the apron of the ferry when he heard a terrific noise, and as he looked around the car went off the ferry. He had himself parked the car. Across the rear end of the ferry there was a 7/8-inch

steel cable properly secured, which he made fast at all times. It was secured on the starboard side with an eyebolt and on the other side with a pelican hook which passes through the eyebolt, which is 3/4 of an inch in diameter. The pelican hook is 5/8 of an inch in diameter, of wrought iron, and passes through the eye; it is then pulled completely around back parallel with the cable and a sliding shackle (sleeve) on the cable fits over the end. When the hook is in place the cable is taut and about 2½ feet from the deck. He knows the cable was up, he saw it before the ferry left the dock, and it would support several tons. When he heard the loud noises, he saw the front of the car turning east and jump up and twist as the back end went off. A wooden approach about 18 feet long and 5 feet wide practically covers the entire end of the ferry. It is about 12 inches high at the highest point, and one at the lowest. The car went off at a terriffic speed and struck the cable, bending the pelican hook in a bow. The hook bent through the terrific force and gave way, and it and the cable went overboard. The motor of the car was racing when it went overboard. He ran back with a life ring and handed the man the same cable and pulled him out. He never removed the chocks from under the wheels of the car. That all recommendations of the United States steamboat inspection were regularly carried out.

Captain West testified the hook and wire were hanging in the water after the accident, and the hook had been pulled out in a semi-circle, and it was fast to the wire (i. e., cable).

An employee of the United States Coast Guard said he found the car in the slip 25 feet astern of the ferry at Bolivar; he hooked the front end of the car with his anchor; it would have been impossible to move it by hand.

Another employee of appellant testified he was on the wharf; the engine was making a good lot of noise. This happened before the ferry got to the landing. He jumped about, made the lines fast, rowed around, and picked up two tires close to the side of the slip.

Another witness testified that when the ferry left the Galveston side, the barrier was put up by him and was in place, the wire was taut, and the ring was clipped over the end of the hook as customary. When he heard the loud roar of the motor,

he ran back, the wire barrier was in the water, and the hook bent, but the cable was not broken.

A passenger on the ferry testified the car started up, the motor racing; suddenly it gave a jerk and went like lightning overboard; the women in it screamed; a colored fellow on, the side was trying to get in it, and went overboard with it. The Chevrolet struck the wire cable which was in place. When the car started it jerked like it hit something (like a chock). Sounded like the engine was wide open. From the sound it was going from 30 to 40 miles per hour. He saw the cable taut when the car hit it. There was evidence that when the car was removed from the water the throttle was open, and the gears in reverse; the back end had rear bumper missing as picture shows. The justice of the peace testified the car was in reverse gear and throttle half open. The ferry was shipshape and seaworthy.

■ There was sufficient evidence to warrant the submission of the special issue of whether the cable on the rear of the ferry was properly connected with the eyebolt designed to hold it in place; and if the failure to have it properly connected was negligence; and if same were the proximate cause of the drowning of appellee's son. The evidence as to the force with which the car was moving was conflicting.

■ As stated by this court in Stinnett v. Gulf, C. & S. F. Ry. Co., 38 S.W.(2d) 615, 617, Justice Graves delivering the opinion: Under the well-settled rule laid down by our Supreme Court in Wininger v. Ft. Worth & D. C. Ry. Co., 105 Tex. 56, 143 S.W. 1150, an issue of fact is raised "if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff. See, also, Texas & P. R. Co. v. Cox, 145 U.S. 593, 12 S.Ct. 905, 36 L.Ed. 829; Brown v. Griffin, 71 Tex. 654, 9 S.W. 546; Texas & P. R. Co. v. Ball, 96 Tex. 622, 75 S.W. 4; International & G. N. Ry. Co. v. Tinon (Tex.Civ.App.) 117 S.W. 936."

If, when the pelican hook was passed through the eyebolt, the sliding sleeve was not put in place, the accident, together with all the other evidence, seems explained. Though the man whose duty it was

to attend to this testified he did so, it was the prerogative of the jury to infer he was mistaken. This the jury appears to have done.

We do not find the conflict between the answers to special issues which appellant insists occurs in this case.

Judgment affirmed.