## CASEMENT v. BROWN.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF OHIO.

No. 173. Submitted March 24, 1893. — Decided April 10, 1893.

A contractor agreed with a railroad company to construct piers for a bridge over the Ohio River of sizes and forms, in places, and of materials, in accordance with plans and specifications furnished by the company, and to furnish the materials and perform the work of preparing and keeping in place, buoys and lights to warn against danger. By reason of a flood one of these piers was submerged, and the buoy and light placed to give warning of it were carried away. The contractors failed to place a new buoy and light. One of the barges in a tow struck on the pier and was lost. In an action against the contractor to recover damages therefor, *Held,*

(1) That the defendants were independent contractors, and not employés of the company; and as such were liable for injuries caused by their own negligence;

(2) That having omitted to replace the buoy, although they knew of the necessity therefor and had ample time to do so, or otherwise to warn of the danger, they were guilty of negligence, and responsible for injuries resulting therefrom;

(3) That there was no contributory negligence on the part of those navigating the vessel destroyed; as it would be placing too severe a condemnation on the conduct of the pilots in charge to hold that an error of judgment, a dependence upon the appearance of the stream and a reliance upon the duty of the contractors to place suitable buoys and other warnings, were such contributory negligence as would relieve the contractors from liability.

THIS was an action to recover the value of three barges of coal, lost, as claimed, through the negligence of the defendants. The case was commenced in the Court of Common Pleas of Scioto County, Ohio, and removed to the Circuit Court of the United States for the Southern District of Ohio. There it was tried by the court without a jury; findings of fact were made, and from those findings the conclusion was reached that the defendants were guilty of negligence. Whereupon judgment was entered in favor of the plaintiffs for the amount of the loss.

These facts appeared in the findings : Early in the year of 1882, two railroad corporations, one an Ohio and the other a West Virginia corporation, obtained proper authority from those States and from the United States government for the construction of a railroad bridge across the Ohio River, opposite the village of Point Pleasant, in West Virginia. The plan of the bridge and the number and size of the stone piers were submitted to the proper officers of the United States government, and approved, and the bridge and piers were duly constructed as authorized by such officers.

" There were six stone piers provided and built for the support of said bridge, one of which stood on top of the bluff bank of the river on the West Virginia side, another on top of the bluff bank on the Ohio side, and the other four between said banks of the river. Said four piers between the banks are known as ' A,' ' B,' ' C,' and ' D.' Said pier ' A,' being on the West Virginia side of the river, was located and built at the outer edge of low-water mark ; pier ' B,' 250 feet west therefrom ; pier ' C,' 250 feet west of pier ' B,' and pier ' D ' at the edge of the water at low-water mark on the Ohio side, at the distance of 500 feet from said pier ' C,' the west side of pier ' A ' and the east side of pier ' D ' reaching to the edge of the water at low-water mark. The long span between piers ' C ' and ' D ' was duly established as the channel span after notice duly given and consultation with those engaged in the navigation of the Ohio River, as required by law."

On January 27, 1882, these corporations entered into a written contract with the defendants for furnishing the ma-

terial and building these piers.  This contract in terms provided that defendants were "to furnish all material of every kind, name and description necessary for the construction of the same, said material to be subject to the approval of said engineer and to be of such quality as may best insure the durability of said structure; to be at the expense of and subject to all expenses incident to and connected with said work of construction, the said work to be done and completed according to the plan and specifications hereto annexed, marked A, and subject to the inspection and approval of the said engineer of said companies in charge of said work, and which said plans and specifications are hereby expressly made a part of this contract."  It further provided that "the work throughout will be executed in the most thorough, substantial and workmanlike manner, under the direction and supervision of the engineer of the company, who will give such directions from time to time during the construction of the work as may appear to him necessary and proper to make the work complete in all respects, as contemplated in the foregoing specifications.  Said directions of the engineer will in all respects be complied with.  The engineer will also have full power to reject or condemn all work or materials which, in his opinion, do not conform to the spirit of the foregoing specifications, and shall decide every question that may arise between the parties relative to the execution of the work, and his decision in the nature of an award shall be final and conclusive on both parties to this contract."

Under this contract the defendants had, at the time of the injury, completed the two piers on the banks, and partly constructed the four piers between the banks.  For two weeks before the injury the river had been rising rapidly, and the water was very high.  Business on the river had been partially suspended on account thereof.  On the Ohio side the bank was under water, which extended inland a quarter of a mile or more.  The stage of the water in the river was then fifty-five feet above low-water mark.  Three of the piers were from thirty-seven to forty-seven feet below the surface of the water, while pier "D" on the Ohio side, which had been completed

to forty-eight feet above low-water mark, was covered to the depth of only about seven feet.

"5. There is a very slight curve in the river at Point Pleasant, the Ohio shore being on the convex side, and at high stages of water it is customary and proper for coal fleets to 'run the points,' running near the shore on the Ohio side at a distance of a quarter of a mile and more above the bridge in descending the river and bearing out to the left of channel pier D and between channel pier D and C and running in near the shore on the West Virginia side about two miles below said village of Point Pleasant, and the channel of the river was between said channel piers C and D, and the usual and proper course was to run between said piers C and D, running the points as before stated.

"6. The night before the accident, the plaintiffs' three steamboats — the 'Resolute,' the 'Alarm,' and the 'Dexter' — with coal barges in tow, tied to shore during the night some distance above the bridge.

"The 'Resolute,' with its tow, was in advance of the other two, passing the bridge on the morning of the accident between eight and nine o'clock. The 'Alarm,' with its tow, reached the bridge about 10 o'clock in the morning. Its tow consisted of six coal barges, three abreast, each barge being twenty-six feet wide and drawing between seven and eight feet of water. The front middle barge ran upon and struck said channel pier D, which caused the injury complained of.

"The steamer 'Dexter,' with its tow, passed shortly after between said channel piers C and D, where the 'Resolute,' with its tow, had previously passed, and while one of the 'Alarm's' barges that struck said pier D was still lying on said pier in plain view.

"7. The morning of the accident was clear and calm, and the Alarm, with its tow, was steaming and handling well. The pilot in charge was well acquainted with the Ohio River at that point and from Pittsburg to all points below, and while the work of constructing said pier was going on had passed there twice a week and saw and knew where said piers were located and to what extent the work had progressed and where

the channel span had been established and its length, and also knew that prior to the location of said bridge the usual channel for coal fleets in passing down the river was further to the left, between piers B and C and near to said pier B.

" 8. As the Alarm approached the bridge no halt was made nor was any one sent forward in a skiff or otherwise to take observations or make inquiry. The pier standing on the Ohio bank, twenty-four feet out of water, was in plain view and was seen by said pilot and others in the pilot-house, and the same was the case as to the pier on the east bank of the river.

" The village of Point Pleasant and its buildings, well known to pilots and other rivermen, were also in plain view.

" There were also on the Ohio side, between the top of the bank, both above and below the bridge, growing trees, the tops of which were some distance out of water, that were in plain view and were noticed by said pilot, but for the distance of about a quarter of a mile immediately above and below said bridge the line of trees did not extend. At the time of the accident there were present in the pilot-house, aiding and assisting the pilot in charge, the other pilot of the Alarm and three other pilots, who were on the lookout, making observations and consulting as to the passage of the bridge, none of whom saw any buoys or break to indicate where the pier was. Another man acted as lookout, was on the extreme front of the tow, and he saw no buoys or break to indicate the location of said pier D.

" 9. During the building of said four piers between the banks of the river proper buoys had been kept upon the same, to which, during the night, proper lights had been attached as signals to warn passing boats and other water craft of danger; but for some days prior to the accident, on account of the height of the water and the large quantity of floating drift, the buoys had been carried off and floated down the river, but had been secured and replaced till the night preceding the accident or the night previous to that, when the buoy on pier D had again been washed off and had not been replaced at the time of the accident, and the fact of its absence was known to the defendants early in the morning of the accident, and they

made no effort to restore it till after the accident, and that they might have done so; neither did they send any one up the river or adopt any other plan, as they might have done, to notify approaching boats of the absence of said buoy, or adopt any other plan.

"10. The said railroad companies provided, employed and paid for the services of a chief and an assistant engineer to superintend said work, one of whom was at all times on the ground and gave directions as to the mode and manner of constructing said stone piers and decided as to the quantity of stone, the height and size and shape of the piers, and performed all the duties specified in said written contract. Said railroad companies, through said engineers as their agents, duly authorized, took charge of, directed and controlled as to providing buoys and lights to be kept upon said piers, the character of the same and the mode and manner of fastening them to said piers and keeping them in place. Said engineers of said railroad company, however, on behalf of said railroad company, employed the defendants to furnish the materials and perform the work in preparing said buoys and lights, and in putting them up and in keeping them in place when and as directed by said engineers. The defendants were paid for said materials and work, an account of which was kept by defendants and was carried into their monthly bills with the stone-work, and was settled and paid for with the other work.

"Prior to said accident said engineers had given to the defendants such directions as to the character of such buoys to be used, and as to the mode and manner of putting them and keeping them up, and it was the duty of defendants to see that they were kept up and replaced when washed away, under said instructions previously given and without waiting for future instructions, and which they had undertaken to do."

Upon these facts, the court found as conclusions of law:

"1. That the defendants, by the terms of said written agreement made with said railroad companies, are independent contractors, and are liable to the plaintiffs for the injury complained of.

" 2. That the agreement made by defendants with said railroad companies to furnish the material and do the work in preparing, putting up and keeping up said buoys and lights on said piers created the relation of independent contractors, and made the defendants liable to the plaintiffs for the injury complained of.

" 3. That it was the duty of defendants to have kept a buoy upon said pier D, and if washed off by drift or otherwise to have replaced it, or, if this could not have been done, on the morning of the accident, before the injury, they could and should have sent some one up the river a sufficient distance above the bridge, or adopted some other plan, to notify approaching boats of the loss of such buoy and of the location of the piers, and their failure to do so constitutes negligence on their part, and under such circumstances those in charge of plaintiffs' coal boats were not chargeable with negligence in failing to make accurate calculations as to the location of said pier D from the other objects in view and seen by them or that they might have seen.

" 4. That the plaintiffs and their agents in charge of the tow were at the time in the exercise of reasonable and proper care in the management and navigation of the tow, and were not guilty of contributory negligence; that at the time of the accident the plaintiffs' boat Alarm, with its coal tow, was in the usual and proper place of navigation at that stage of water."

Judgment having been entered in accordance with these findings and conclusions, defendants sued out a writ of error from this court.

*Mr. W. A. Hutchins* and *Mr. J. W. Bannon* for plaintiffs in error.

*Mr. Thornton M. Hinkle* for defendants in error.

MR. JUSTICE BREWER delivered the opinion of the court.

The defendants contend: First, that they were not independent contractors, but employés of the railroad companies,

and that, therefore, the railroad companies and not themselves were responsible for any negligence; second, that they were not guilty of any negligence; and, third, that if they were, the plaintiffs were also guilty of contributory negligence, and therefore debarred from any recovery.

With reference to the first contention: Obviously, the defendants were independent contractors. The plans and specifications were prepared and settled by the railroad companies; the size, form and place of the piers were determined by them, and the defendants contracted to build piers of the prescribed form and size and at the places fixed. They selected their own servants and employés. Their contract was to produce a specified result. They were to furnish all the material and do all the work, and by the use of that material and the means of that work were to produce the completed structures. The will of the companies was represented only in the result of the work, and not in the means by which it was accomplished. This gave to the defendants the status of independent contractors, and that status was not affected by the fact that, instead of waiting until the close of the work for acceptance by the engineers of the companies, the contract provided for their daily supervision and approval of both material and work. The contract was not to do such work as the engineers should direct, but to furnish suitable material and construct certain specified and described piers, subject to the daily approval of the companies' engineers. This constant right of supervision, and this continuing duty of satisfying the judgment of the engineers, do not alter the fact that it was a contract to do a particular work, and in accordance with plans and specifications already prepared. They did not agree to enter generally into the service of the companies, and do whatsoever their employers called upon them to do, but they contracted for only a specific work. The functions of the engineers were to see that they complied with this contract — "only this, and nothing more." They were to see that the thing produced and the result obtained were such as the contract provided for. *Carman* v. *Steubenville & Indiana Railroad Company*, 4 Ohio St. 399, 414; *Corbin* v. *American*

*Mills,* 27 Connecticut, 274; Wood on Master and Servant, 610, § 314.

'It is unnecessary to inquire whether, because of the supervision retained by the companies through their engineers, or because the work which was done was work done on a public highway, the companies might also be responsible for any negligence in the progress of the work. 2 Dillon on Municipal Corporations, 4th ed., § 1030; *Cleveland* v. *King,* 132 U. S. 295; *Chicago* v. *Robbins,* 2 Black, 418; *Robbins* v. *Chicago,* 4 Wall. 657; *Water Company* v. *Ware,* 16 Wall. 566. It is enough for this case that these defendants contracted to do the work, and to produce a finished structure according to certain plans and specifications, and having made such contract, and engaged in such work in accordance therewith, they are responsible for all injuries resulting from their own negligence. While doubtless the original written contract would cast upon the defendants as contractors the duty of taking all reasonable precaution, by buoys or otherwise, to warn those travelling on this public highway of any danger arising from their work, yet, in addition, it appears that there was a special contract by which they agreed to furnish the material and perform the work of preparing and keeping in place buoys and lights to warn against all danger. Surely, having made a contract to do the entire work, and in addition a special agreement to keep proper buoys and lights in place to warn persons of danger, it does not lie in their mouths to say that their negligence and omission of this contractual duty cast no responsibility upon themselves, but was only the negligence and omission of duty of the railroad companies, for which the latter, and the latter alone, were responsible.

Secondly, equally clear is it that they were guilty of negligence in failing to replace the buoy over this submerged pier. According to the findings, they knew that that which had been there had been carried away, and had ample time to put another in its place. They knew of the submerged pier, and of the danger to boats therefrom; they knew what was necessary to guard against that danger, for they had previously been taking the proper precautions. Having omitted to replace

the buoy, although they knew of the necessity therefor and had ample time to do so, or otherwise to warn of the danger, they were guilty of negligence, and responsible for all injuries which resulted therefrom.

But the stress of this case arises on the third of their contentions, and that is, that the plaintiffs were guilty of contributory negligence. It is said that the river was so high that it was dangerous to attempt to run a steamboat with barges down the current; that the piers on the shores, on either side, were visible, and in fact seen by the pilots, and thus they knew the line on which were placed the then submerged piers in the river; that they were familiar with the river at this place, knew that a bridge was being constructed, and during its construction had passed there twice a week, and saw and knew where the piers were located, and to what extent the work had progressed; that the day was clear, and the steamer under control, steaming and handling well; and that although approaching where they knew were these partially constructed piers, and seeing that they were submerged, no halt was made, nor any one sent forward to take observations or make inquiry. In view of these facts, it is strenuously urged that the pilots and officers of the steamboat were guilty of negligence which contributed directly to the injury, and that, therefore, the plaintiffs, being responsible for the negligence of their agents and employés, cannot recover. It must be conceded that these facts, thus grouped together, point in the direction of negligence on the part of the pilots and officers. They knew that there was danger there, and, therefore, were bound to take suitable precautions to guard against it; they knew that pier " D " was near the Ohio shore, and that its construction had progressed further than that of the other piers, and still they did not direct the course of the boat away from that shore, and into the unobstructed channel.

On the other hand, it must be observed that the mere fact of high water does not establish negligence on the part of the plaintiffs. Indeed, as water is a necessity for and means of steamboat navigation, it would seem that the more water the less danger. If it be said that the increased volume of water

increases the current, and, therefore, the difficulty of controlling the motions of the vessel, it is enough to say that the findings show that there was no difficulty or danger in this case on that account. The injury resulted from a submerged obstruction, and the more water there is, apparently the less danger from such sources. It is true, the findings state that business on the river was partially suspended on account of the high water. That may have been because prudent men were unwilling to risk the dangers arising therefrom, or because everything on the river driven by steam power was needed to prevent the high water from carrying away personal property along the shore, and to collect that which was being borne away. Whatever may have been the reasons, the fact that business was only partially suspended is satisfactory evidence that it was not in and of itself negligence for these plaintiffs to attempt to run their boats down the river. If it be said that the pilots ought to have taken the boats farther out into the channel, it is sufficient answer that it is found as a fact that it was both customary and proper for coal fleets, such as these, to keep somewhat near the Ohio shore at this place, " running the points," as the expression is, and the fact that, in this case, they miscalculated the exact location of the submerged pier does not subject them to the condemnation of negligence. It seems from this finding that they were pursuing the proper as well as the customary course, and a mere error of judgment is not, under such circumstances, negligence. While it is true the findings state that the pilots knew where the piers were located, and to what extent the work had progressed, having been in the habit of passing there twice a week during the construction, yet it is not to be assumed therefrom that the court meant to find that these pilots knew the exact height to which pier " D " had been carried, the exact stage of the water at the time, and, therefore, the exact depth of the water above the pier, and also its exact location in the river. All that can reasonably be inferred from the language is, that they possessed such knowledge of the location and construction of the piers as they would acquire from passing up and down the river twice a week in boats. And in reviewing a judgment

it is not proper to place any narrow, strained or strict construction on the language with which the court describes its findings of fact, in order to sustain the contention that they do not support the conclusions of law and the judgment. On the contrary, if any reasonable and fair construction thereof will sustain the judgment, such construction should be. recognized and adopted by the appellate court as the true construction. If it be said that, knowing, as they did, that somewhere in the line between the two shore piers was this submerged pier " D," they should have ascertained for a certainty its exact position before proceeding on their course, it may be replied that the fact that this was an artificial obstruction, placed there by parties still engaged in the construction of a bridge across the river, and, therefore, having a present duty of caring for the structures and seeing that no one was injured thereby, is a fact of significance. If it was a natural obstruction, one in respect to which no party had any duty of preservation or warning, it might be that the obligation resting upon the pilots would be of a different and more stringent character. But they knew that here a great work was being constructed by these defendants; that it was their duty to give all needful warning to persons and boats going up and down the river; and that, if there were no buoys in place or other warning given, they might fairly conclude that all of these piers were so far submerged as to threaten no danger to passing boats.

Further, as appears from the findings, they saw no break in the water, nothing which would indicate that the top of the submerged pier was near the surface. And still further, one of the boats in the fleet had but shortly before passed there in safety. They evidently relied on two facts: First, that the appearance of the water in the course they were taking indicated that the pier, if in that course, was so far submerged as to threaten no danger; and, secondly, that if there were any danger to be apprehended from such an obstruction, the parties in charge of the work would have indicated by buoys or otherwise the place of the danger. Shall they be condemned because they relied upon the defendants' faithful discharge of the duty of giving suitable warning, and in the absence of such warning

believed there was no danger, and seeing nothing in the appearance of the water to suggest danger, pursued that which was the customary and proper course for boats to pursue in passing from above to below the line of the bridge? It appears from the findings that the lookout was not confined to one person, but that several were gathered in the pilot-house, on the lookout for all indications of danger, and all customary guards and warnings.

We are of opinion that the conclusion of the Circuit Court was right, and that it would be placing too severe a condemnation on the conduct of the pilots in charge of the boats, to say that their error of judgment, their dependence on the appearance of the stream, and their reliance upon the duty of the defendants to place suitable buoys or other warnings, was such contributory negligence as would relieve the defendants from liability for the results of their almost confessed, and certainly undoubted, negligence.

*The judgment is affirmed.*