(121 So. 410)

**BUGG v. SANDERS. (6 Div. 204.)**

Supreme Court of Alabama. March 28, 1929.

Charles E. Rice, Clarence Meadows, and L. D. Gardner, Jr., all of Birmingham, for appellant.

Hayden & Hayden, of Birmingham, for appellee.

SAYRE, J. Appellee sued appellant Bugg, as receiver of the Atlanta, Birmingham & Atlantic Railway Company, for damages suffered by reason of a personal injury alleged to have been caused by the negligence of a coemployé. The parties to this cause were at the time of appellee's injury engaged in interstate commerce, and the suit was brought under the Federal Employers' Liability Act, 35 Stat. at Large, p. 65, Comp. Stat. 1913, §§ 8657–8665; 45 USCA §§ 51–59. At the trial the court gave the general charge requested by appellant, and verdict and judgment went accordingly—this, on the stated ground that there was no evidence tending to show that appellee was an employé of the defendant corporation or its receiver. But, afterwards, on appellee's motion that judgment was set aside, and from that order this appeal is taken.

Appellant now insists that the general charge was properly given, and, to sustain that contention, submits the following statement of the evidence, which, with some ad-

ditions to be noted, fairly discloses the whole effect of the evidence: "The evidence shows that on January 1, 1925, the plaintiff was working in the A. B. & A. yards, transferring water pipe out of a broken down railroad car into a good car, by means of skids between the two cars. The plaintiff was working under the direction and control of one Alex Breckenridge, a colored man. Breckenridge had a contract with defendant, which was not in writing, whereby Breckenridge transferred freight from all 'bad order' cars to 'good order' cars. By this is meant that when a car came into the defendant's yard, loaded with freight and consigned over defendant's line, which was in such bad condition that it should not be sent out, the freight in the car was transferred into a car in good order. Whenever a railroad inspector condemned a car as being 'bad order,' it was tagged and placed upon the transfer track. Thereupon Breckenridge transferred the freight from such car to a 'good order' car that was spotted alongside. In doing this work, Breckenridge employed such men to help him as he saw fit, depending upon the material to be transferred and the number of bad order cars. The plaintiff and the other men working with him at the time of his injury had been so employed by Breckenridge. Breckenridge gave all orders to such men as to the manner of doing the work, and otherwise supervised and controlled them, and paid them himself, the amount of such pay being either so much an hour, or so much a ton. The tools used by Breckenridge and his men were owned by him. Breckenridge received from the defendant so much per ton or car, for transferring the freight. He was not carried upon the pay rolls of the defendant, nor were the men he employed, although a regular pay roll was kept by the local freight agent of employés, which was sent to Atlanta, and such employés were paid by checks which came from the head office. Breckenridge was paid after each car was transferred, in cash, upon signed 'transfer slips,' which slips were then sent by the local agent of defendant to its auditor to account for the cash paid, and the auditor would then charge such amount to the railroad which had delivered the 'bad order' car. After Breckenridge was paid by defendant, he would pay the men employed by him, except that sometimes, if he had the money in his pocket, he would pay his men before being paid by defendant. The number of cars transferred daily by Breckenridge depended upon the number of 'bad order' cars spotted each day, varying from one to seven. When there were no bad order cars, Breckenridge and his men did nothing. Breckenridge had the entire supervision and control over the manner of doing the work. No one gave him or his men orders as to the manner of transferring the goods. After a car was transferred, an agent of defendant would inspect it to determine if it was properly loaded.

The defendant did not know how many men Breckenridge hired, or who they were, gave no orders to such men, and did not discharge them."

In addition we note these statements by the plaintiff as witness, of more or less importance: "He [Breckenridge] got the money to pay off out of the office. He took the time up there and got the money and come back and paid me off. I don't remember how it was carried, whether it was in an envelope or not. * * * That is where he got the money. None of the hands never did go draw any money. He did all the drawing. I have seen him turn in the time and count the money out." And this: "You ask me if I ever see him [Breckenridge] working around the railroad moving things from one car to another car, and I answer that he works sometimes when he is short of hands. I have seen him having other folks to do that. That has been going on ever since I come here. This man that worked there in the office, Anderson, he come out there and gave orders what to do. He gave Alex orders—told him if they didn't work to turn them off and get more. After he gave those orders the men started getting that pipe over there."

We are not aware of any difference in principle between the decisions of the Supreme Court of the United States and our own in respect of the matter under consideration, but, since this action is prosecuted under the federal statute, and the decisions of that court are conclusively authoritative, we have had recourse to the decisions of that court.

In Casement v. Brown, 148 U. S. 615, 622, 13 S. Ct. 672 (37 L. Ed. 582), the defendants contended that in building piers for a bridge across the Ohio river they were not independent contractors, but employés. Defendants had contracted to build the piers of prescribed form and size at the places fixed. "They selected their own servants and employés. Their contract was to produce a specified result. They were to furnish all the material and do all the work, and by the use of that material and the means of that work were to produce the completed structures. The will of the companies was represented only in the result of the work, and not in the means by which it was accomplished. This gave to the defendants the status of independent contractors, and that status was not affected by the fact that, instead of waiting until the close of the work for acceptance by the engineers of the companies, the contract provided for their daily supervision and approval of both material and work. The contract was not to do such work as the engineers should direct, but to furnish suitable material and construct certain specified and described piers, subject to the daily approval of the companies' engineers. This constant right of supervision, and this continuing duty of satisfying the judgment of the engineers, do not alter the fact that it was a contract to do a particular work, and in accordance with plans and spec-

ifications already prepared. They did not agree to enter generally into the service of the companies, and do whatsoever their employers called upon them to do, but they contracted for only a specific work. The functions of the engineers were to see that they complied with this contract—'only this, and nothing more.' They were to see that the thing produced and the result obtained were such as the contract provided for:" So says the Supreme Court of the United States. We concur. In Chicago, Rock Island & Pacific R. Co. v. Bond, 240 U. S. 449, 456, 36 S. Ct. 403 (60 L. Ed. 735), the case of a suit brought under the Federal Employers' Liability Act, the court cited and approved Casement v. Brown, supra, on the point now at issue. The court thus spoke of Turner, who, in that case, occupied a position and discharged a function quite like that of Breckenridge in this: "Turner [whose contract was to handle coal from cars and to place the same in the coal chute pockets of the company] was something more than a mere shoveler of coal under a superior's command. He was an independent employer of labor, conscious of his own power to direct and willing to assume the responsibility of direction and to be judged by its results. * * * We certainly cannot say that he was incompetent to assume such relation and incur its consequences." The Bond Case was followed in Drago v. Central R. Co. of New Jersey, 93 N. J. Law, 176, 182, 106 A. 803.

If, as appellee suggested in his motion for a new trial, the contract, in the performance of which Breckenridge and appellee were engaged, was entered into with the intent to evade responsibility under the federal act, and so was void under section 5 of the act, we do not find evidence in the record to sustain that suggestion. The relation brought about by the arrangement between Breckenridge and appellant may appear to be novel or unusual, but that fact alone cannot be held for evidence that the relation between them was that of employer and employé, and so that appellee was an employé of appellant, co-employé with Breckenridge, rather than his employé. As we view the record there is nothing more tangible to support appellee's case at this point than a vague feeling that perhaps appellant would not have entered into a contract of that sort. But that is not evidence. It will not suffice to sustain the burden of proof resting on appellant. Hence, our conclusion that the court was right in the first instance when it charged the jury, with hypothesis that they believed the evidence, to find for defendant, and erred when it set aside the resulting verdict and judgment.

Other grounds of the motion for a new trial are argued in the brief for appellant, but we have no brief from appellee suggesting that the court committed any other alleged error on the trial. However, the other errors assigned in appellee's motion in the trial court have been examined without finding that the granting of the motion should be justified on other grounds. We have therefore pretermitted any further statement as to the law of the case.

Reversed and remanded.

ANDERSON, C. J., and THOMAS and BROWN, JJ., concur.