## ROYAL INDEMNITY CO. v. BLANKENSHIP.
### No. 9868.

Court of Civil Appeals of Texas. Galveston.
July 14, 1933.

Rehearing Denied Nov. 16, 1933.

Hunt & Hunt and H. G. Butts, all of Houston, for appellant.

Bailey P. Loftin and Sewell, Taylor, Morris & Garwood, all of Houston (Larry W. Morris and W. J. Knight, both of Houston, of counsel), for appellee.

PLEASANTS, Chief Justice.

This suit was brought by appellant to set aside an award of the Industrial Accident Board in favor of appellee against appellant for compensation for injuries alleged to have been received by appellee as an employee of the Crain Ready-Cut House Company (hereinafter designated Crain Company), to whom the appellant had issued its policy of insurance insuring the employees of the company against injuries received by them in the performance of the work of their employment.

The trial de novo in the court below with a jury resulted in a verdict and judgment in favor of appellee for compensation at the rate of $20 per week for 52 weeks from the date of his injury, amounting with interest to the sum of $1,040, and for further compensation for 73 weeks at the rate of $7 per week, with interest.

The first proposition presented in appellant's brief is as follows:

"The undisputed evidence shows that plaintiff was an independent contractor and that there was present every element of such contract, it being shown:

"A. That the work to be done was such as required special skill for its proper performance.

"B. Plaintiff was to produce certain results by such means and methods as he thought proper and employed his own men and fixed their hours of labor and remuneration.

"C. He undertook the performance of a definite piece of work and his stipulated remuneration was a gross sum, and

"D. He was a free agent as to his hours of labor, the number of employees on the job and the time and manner of payment to them for their services, and defendant's motion for directed verdict should have been sustained."

The undisputed evidence shows that appellee, plaintiff below, who is sixty years of age and had followed his trade all of his life, and regularly for 15 or 16 years, is an experienced carpenter. For five or six years prior to 1930 he had worked for the Houston Ready-Cut House Company, the predecessor in the business now conducted by the Crain Ready-Cut House Company, doing carpenter work in the construction of houses for the company.

In August, 1930, he was called from New Mexico, where he had gone in search of work, by a friend of his, a Mr. Brinkley, who wired him that he, Brinkley, had a house for him to build for the Crain Company. He returned to Houston on receipt of this telegram, and found that through prior arrangements with Brinkley he had the job of building house No. 1 for $366, which was to be a turnkey job for the carpenter work; when he returned, Brinkley was in charge, but plaintiff himself took charge thereafter; carpenter work required considerable skill and training and it is necessary to serve a considerable length of time as an apprentice before becoming a skilled carpenter. Plaintiff was at the time a skilled craftsman; he could read blueprints, plans and specifications, and had had experience in directing men, and was the head of the jobs he was doing.

This house he was constructing for the company was in Southside place, an addition to the city of Houston which was owned by the Crain Company. The houses which the company was constructing on lots in this addition were built for sale. The company had an office in the addition which was in charge of Mr. C. R. Brace. While engaged in constructing the house that he first went to work on when he returned from New Mexico in response to Mr. Brinkley's telegram, Mr. Brace, who was out on the job overlooking the work being done by him in constructing this house, told appellee that he had another house for him to build, and wanted him to start it in a day or two. Appellee told him all right, and went over to the place where the house was to be constructed within the time specified, and found the concrete foundation for the house ready, and some of the materials for construction, the sills, and some other material on the ground, but he had no plans and specifications. He started the work of laying the foundation timbers on the concrete, and went down to Mr. Brace's office to see about the plans, and got a blueprint of the plans about 10 o'clock that morning. The next day after all the foundation and subfloor was in and the work was ready to begin on constructing the walls, Mr. Brace came out and he and appellee agreed that appellee was to receive the sum of $385 for constructing the wooden portion of the house, the outside walls of which were to be of brick, and were not constructed by appellee. Appellee was not furnished with any specifications for his work. When he asked about specifications, Mr. Brace told appellee that he had none, "that he would be the specifications."

In the construction of these houses plaintiff hired and fired the three men employed to assist him in doing the work, and made his own arrangements with these men as to their wages. He furnished his own tools, and the Crain Company furnished all material. He got $366 for the first house, but made nothing out of his contract, and so told Mr.

Brace, who then agreed to pay him $385 for the second house. Plaintiff testified that in the construction of this second house, where he received the injury for which he seeks compensation from appellant, he had the right to hire and fire his own help and did so, which was of no concern to Brace; furnished his own tools and used Brace as the specifications on this job the same as he did on the other; he was his own free agent as to his hours of labor, he could go to work when he pleased and quit when he pleased, so long as he delivered the goods; Brace got after him one day about working longer hours and plaintiff told him he would not work longer hours and refused to do it and worked such hours as he pleased. Plaintiff further testified that on all jobs there was a general construction foreman and if a workman was laying a floor and was not doing it in a good workmanlike manner, he would be called down and stopped, and the owner would not wait until he got it laid and then make him take it up; that when Brace came out and said that one of plaintiff's men was not laying the floor right, he came and told plaintiff about it.

The several instances relied on by appellee to show such control by Brace of appellee in doing the work of constructing the building as to destroy appellee's status as an independent contractor show nothing more than the exercise of the right of the owner to inspect the work as it progressed and require that it be done in a workmanlike manner. It is true that in one or two instances appellee deferred to Brace as to how some of the smaller details of the work should be performed. The following illustrates the character of the instances in which appellee followed the direction of Brace in doing the work. It was proper and necessary to place what is known as weather strips around the windows in the buildings. Appellee testified in reference to this detail of the work that Brace told him that these strips had to go around the windows, and showed appellee how to put them on. He further testified that he did not know how Brace wanted them put on because he had no specifications showing how they should be placed, "and since Brace was the specifications" he asked him how he wanted them put on, and he told him. It appears from the evidence that in carrying out their contracts for the construction of the houses both appellee and Brinkley, because of the absence of specifications, consulted Brace in regard to some of the minor details. Brinkley testified: "Well, like anything we did not understand, you see we had no specifications to go by, and anything we did not understand, we would go to him with it."

Appellee paid his employees' wages with money advanced him by Brace. The amount of such advances as fixed by agreement of the parties, was that the Crain Company, acting through Brace, would advance or pay appellee 80 per cent. of $6 per day for each of the men working on the job. The evidence shows that this was the agreed method of the parties in arriving at the percentages of completion of the work by appellee, and not a payment of the wages of the men.

Upon this state of the evidence we agree with appellant that appellee must be held to have been an independent contractor in performing the work in which he received his injuries, and is not therefore a beneficiary in the insurance policy issued by appellant to the Crain Company for the benefit of its employees. Every element necessary to make him an independent contractor under his agreement with the Crain Company for the construction of the building is shown by the undisputed evidence before set out.

Under his contract he was to take charge and complete the work allotted to him, by the means and methods he deemed proper, for a fixed consideration covering the entire amount to be paid by the Crain Company for the work. He employed and fixed the wages and hours of labor of the men engaged in the performance of the work, and had entire control over them.

We think it clear from the evidence that appellee was not a mere servant or employee of the Crain Company, but that in pursuit of his independent trade or business as an experienced, skillful carpenter he undertook to do a specific piece of work for the Crain Company, using his own means and methods without submitting himself to the control of the Crain Company in respect to the details of the work, and was responsible to that company only for the result of the work. The following authorities fully sustain our conclusion that appellee in performing the work of his undertaking for the Crain Company was an independent contractor, and appellant's request for an instructed verdict should have been granted: Shannon v. Western Indemnity Co. (Tex. Com. App.) 257 S. W. 522; Mansfield Construction Co. v. Gorsline et al. (Tex. Civ. App.) 278 S. W. 485; Smith v. Humphreyville, 47 Tex. Civ. App. 140, 104 S. W. 495; Texas Employers' Ins. Association v. Owen et al. (Tex. Com. App.) 298 S. W. 542; Casement v. Brown, 148 U. S. 615, 13 S. Ct. 672, 37 L. Ed. 582; Litts v. Risley Lumber Co., 224 N. Y. 321, 120 N. E. 730, 19 A. L. R. 1147; Stricker v. Industrial Commission, 55 Utah, 603, 188 P. 849, 19 A. L. R. 1159.

In the Shannon Case, supra, Judge German, speaking for our Commission of Appeals, in a well-considered opinion written in his usual clear and forceful style, discusses many of the authorities dealing with this question of the essential elements of a contract of one person to perform work for another, which conclusively fixes the status of the one under-

taking to do the work as that of an independent contractor, and not a hired employee of the party for whom the work is done. The rules announced in that case are, we think, conclusive of the question presented in the instant case.

Many of the other cases cited declare and follow the well-settled rule that the fact that the person for whom the work is being done inspects or oversees the work as it progresses, and directs and requires that it be done in a workmanlike manner, is of no significance in determining the question of independent contractor. The test of control of the work which makes the person undertaking its performance a mere employee as distinguished from an independent contractor means complete control, and the evidence in this record conclusively negatives such control by the Crain Company of appellee or his employees in the work of construction which appellee undertook to perform for the Crain Company.

These conclusions require that the judgment be reversed and judgment here rendered for appellant.

Because of our conclusion above expressed, it is unnecessary for us to pass upon the remaining questions presented in appellant's brief, but we deem it not amiss to add that we agree with appellee that the insurance contract, considered as a whole, should be construed as including appellee as a beneficiary, if he is not an independent contractor.

Justice GRAVES dissents from our conclusion that the judgment should be reversed and rendered.

Reversed and rendered.

GRAVES, Justice (dissenting).

These are the assigned reasons for the dissent:

(1) That the trial court was correct in holding that the issue of whether or not the appellee was an independent contractor, under the evidence, was one for the jury.

This was a case arising under our Workmen's Compensation Law, hence this definition of an "employee," as therein made in section 1 of R. S. article 8309, is the starting point: "'Employee' shall mean every person in the service of another under any contract of hire, expressed or implied, oral or written, except masters of or seamen on vessels engaged in interstate or foreign commerce, and except one whose employment is not in the usual course of trade, business, profession or occupation of his employer."

It is here apprehended that this enactment changed the judge-made concept at common-law of what an employee generally is, as the holdings in Maryland Casualty Co. v. Kent (Tex. Com. App.) 3 S.W.(2d) 414, and United

States Fidelity & Guaranty Co. v. Lowry (Tex. Civ. App.) 231 S. W. 818, reflect, rather than still permitted a harking back to the rules and standards of that system, as appears to have been done, without, however, an approval of the opinion by the Supreme Court, in Shannon v. Western Indemnity Co. (Tex. Com. App.) 257 S. W. 522.

Appellant's position and this court's holding in adopting it is that the undisputed evidence showed as a matter of law that the appellee was an independent contractor, wherefore no question was left for the jury concerning it; so that, the appellee's suit being predicated on the averment that he was an employee, it is only necessary to inquire into whether or not an issue of fact about the matter was raised, and, as held by this court in Stinnett v. G., C. & S. F. Ry. Co., 38 S.W.(2d) 615, 617, that is determinable upon this principle: "Under the now well-settled rule laid down by our Supreme Court in Wininger v. Fort Worth & D. C. Railway Co., 105 Tex. 56, 143 S. W. 1150, that inquiry must be answered in the affirmative 'if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff.' See, also, Texas & P. R. Co. v. Cox, 145 U. S. 593, 12 S. Ct. 905, 36 L. Ed. 829; Brown v. Griffin, 71 Tex. 654, 9 S. W. 546; Texas & P. R. Co. v. Ball, 96 Tex. 622, 75 S. W. 4; International & G. N. Ry. Co. v. Tinon (Tex. Civ. App.) 117 S. W. 936."

So viewing this record, it seems clear that the issue was raised whether the statutory definition of an employee, supra, be literally applied, or the broader one sanctioned under common-law criteria.

This conclusion is not to be defeated by the conceded fact that there is evidence showing (1) that Blankenship was paid by the job and not by the day; (2) that he had discretion concerning his hours of labor; (3) that he furnished his own tools; (4) that he hired his own men to help him, and paid them not by the day, but in a share of the gross amount to be paid for carpenter labor on the job by the appellant. These enumerated features, at most, are only matters of evidence tending toward a conclusion that he was an independent contractor, but, under our decisions, are far short of being conclusive, as appellants contend, under such cases as Shannon v. Western Indemnity Co. (Tex. Com. App.) 257 S. W. 522, before cited; indeed, the holding in Maryland Casualty Company v. Kent (Tex. Com. App.) 3 S.W.(2d) 414, 415, supra, expressly determines that question as to the first three of these details the other way in this declaration: "True it is that Kent's compensation was determinable with reference to a quantitative standard, that he had some discretion as to his hours or quantity of la-

bor, and that he was to furnish some of the appliances for accomplishing the results contemplated. But those things are but evidentiary, with probative value according to other elements, and are not at all conclusive of an independent contractorship or other relation foreign to that of 'employer' and 'employee.'"

In other words, no one fact or feature of the arrangement between the parties is controlling, the ultimate effect of them all as showing whether or not the one exercises "control" over the other in the prosecution of the precise thing to be done under it being the test, as the court thus declared three years subsequent to the cited Shannon decision in Texas Employers' Ass'n v. Owen (Tex. Com. App.) 298 S. W. 542, 543: "There are many features shown by the evidence and stated by the Court of Civil Appeals, wherein the McKnight Company had and exercised control over the deceased in the prosecution of his work. This is the test. As early as Cunningham v. International Railroad Co., 51 Tex. 503, 32 Am. Rep. 632, the Supreme Court, quoting from Sherman and Redfield on Negligence, said: 'He is deemed the master who has the supreme choice, control, and direction of the servant, and whose will the servant represents not merely in the ultimate result of the work, but in all its details.' This 'control' refers to the services to be performed under the contract; that is, it pertains to the precise thing to be done. It, of course, does not relate to those things excluded from the service through the operation of the contract by reservations, limitations, or the like. It relates only to the service within the contract. There is no reason why one who undertakes to serve another may not stipulate for conditions in that service such as the furnishing of tools, the limitation of hours, and the like, thus in a measure controlling the details of the service, without in any wise becoming an independent contractor. This, for the simple reason he has not undertaken a service in which the employer is interested only in the result of his work and not as to the means by which it is accomplished which feature enters into all the definitions submitted by the courts." See, also, King v. Galloway (Tex. Com. App.) 284 S. W. 942, 943.

As concerns the fourth and last of these conceded features, it plainly is so colorless as to tend either way according to the individual viewpoint; it was undisputedly shown to have been customary for the foreman on a job of constructing a house to select his own helpers and pay them by inter sese agreements out of the sum he himself received from his employer; further, that in this instance the amount to be paid to Blankenship was arrived at by calculating the hours of labor necessary and allowing him a living wage for such time for the carpenter work, leaving to him the privilege of selecting and pay-

ing those under him, substantially just as is usually done where an employer leaves it to his foreman to engage such men as may be needed to assist him in a given task, and to fix their compensation within named limits; here, moreover, as before appears, the added circumstance of Superintendent Brace's having directly threatened to fire one of these employees because he was not doing his work in a satisfactory manner to Brace counterbalances any effect the other way, and strongly tends to indicate that nothing really different in this respect from the customary practice between employer and employee existed here.

Turning now from these legal rules and principles that must control to the case as actually made, it seems apparent that the trial court was justified in submitting it to the jury, because, not only were there irreconcilable conflicts in the testimony as to what agreements were made (expressly or impliedly) and what was done by each of the parties in the performance thereof, but further, ample evidence to raise an issue over whether their actual engagement was merely for the rendition of personal services in carpenter work by the appellee to appellant, under the control and direction of Brace not alone in simply building the house for it, but also as to how that should be done, rather than one for the construction of it as an entirety according to detailed requirements mutually agreed upon in advance.

To demonstrate that such is the state of the testimony, this epitome of it, taken in the main from the appellee's brief, will be found to be a fair résumé from the statement of facts:

Blankenship testified that he did not talk to Mr. Brace about any contract that had been made, but just went to work with Mr. Brinkley, dealing with Brace through Brinkley. Brace was vice president of the Crain Ready-Cut House Company, and was at that time actively in charge of the company, of its company's office in Southside place, and actively engaged in supervising the work of Blankenship and Brinkley.

After Blankenship had begun work on this job Brace wanted a man that was head of the job to sign the bills and collect the money paid for the job, and asked Brinkley and Blankenship which one he was to go to for those things, and Blankenship took the job; it being customary in the building of houses for one man to act as a "straw-boss" under the superintendent or foreman.

On this job Mr. Brace was there looking over Brinkley's work. Blankenship continued working on this house, but before it was completed Brace came to the house he was working on and took him off and put him on another house, which was in the same neighborhood of the house where Brinkley and Blank-

enship had been working; the same being in Southside place.

During the time the house on which Brinkley was working was being constructed, Brace came to the job and superintended the work almost every day, and, on the occasions when he did come, superintended the details of the work, and one day, after Blankenship had gone to the other job, Brace came up to the job where Brinkley was working and threatened to fire a man because he was not laying the floor to suit him; on another occasion Brace and Mr. Miller, an agent of the company, being unable to work out certain details with respect to the plan of the roof of this house, arranged a way to frame the roof and put it up, but Mr. Brace came out and objected, and Brace and the architect figured out a different way to frame it, and Brinkley had to take the roof down and reframe it. There were no written specifications on this job.

One evening while Blankenship was working on the above-mentioned job with Brinkley, Brace came over there and told Blankenship he had another house he wanted Blankenship to start—maybe a couple of days later, and Blankenship went over there Monday morning, and the concrete foundation was in already, and some of the material was on the ground, sills, and one stuff and another, but Blankenship did not have any specifications, nor any plans, and went down to the office and was told that they did not quite have the plans blueprinted; so about 10 o'clock he got the plans and went out to work on the house. At that time no agreement or arrangement had been made as to what Blankenship would be paid for doing this work, and the next day, or maybe the next morning, after all of the foundation was in, and the subfloor was on, 'and' the carpenters were fixing to raise the walls, Brace came along and Blankenship asked him what Brace was going to give him for building the house, and Brace said $385; Blankenship agreed to build the house for that. Brace set the figure at this amount in order that he might pay Blankenship enough to get daily wages out of it. Blankenship had no other contract with Brace about building the house. Before Blankenship went to work, there was no agreement as to how the money agreed upon was to be paid, but at the end of the first week Brace came on the job and Blankenship asked Brace if he would let him have so much money, and Brace said: "I have got it figured out at $6.00 a day with a 20% hold-back." There were three men on the job, and he figured out $18 a day for the labor for the three men, and held back 20 per cent., and paid $6 a day for each man, less 20 per cent., until the work was finished. Blankenship went after the pay for the men, but it was divided between them; Blankenship selected the men to work with him, but regardless of whether the work was being done by an independent contractor or not, it was customary for a foreman on a job in building a house to pick the men he wanted to work under him. Blankenship furnished his own tools, but it is the general custom among carpenters to always furnish their own tools on contract work, as well as on journeyman work.

There was no definite agreement as to when the house was to be completed.

It was the practice of the Crain Company, when constructing houses under contract, to submit plans and specifications for bids, receive bids, let the contract on such bids, and draw up a written contract with the contractor to whom the job was awarded; but this practice was not followed in the company's dealings with Blankenship.

Under the arrangement made between the parties, Blankenship had nothing to do with the brickwork, or the plumbing, and did only the carpenter work, and this was done in such a way that Brace could do whatever he wanted done there. The Crain Company furnished all the material on the job, and Blankenship did not know what material was to be used in the house until it was hauled out to the job. Brace would order the lumber sent out there, the Crain Company furnished it all, and Blankenship did not know what to put in the house, except what they told him, and what they sent.

The company furnished Blankenship plans, but no specifications, and Brace told Blankenship that he did not have any specifications, and that he (Brace) would be the specifications. When a house is built under contract, a set of specifications is always given, and these specifications state the material and workmanship. In doing the work thus agreed upon, Blankenship followed the blueprint, or plans, in a general way, but changes were made in these plans as the work progressed, and when they were made and any directions as to the details of the work given, Brace did it. Brace was on the premises every day while Blankenship was doing this work, sometimes two or three times a day, and would come around on the job and give instructions as to what to do.

On one occasion, while Blankenship was working on this house, Brace told Blankenship to build a garage. There were no plans given Blankenship for this garage, and it did not appear on the plans given him, but Brace told Blankenship what he wanted, and how to build it, and Blankenship was busy putting it up, having proceeded far enough to have the studdings up, but not the walls, when Brace came around and told him that the sills had to be creosoted; Blankenship told him: "Why, Mr. Brace, that is lots of trouble to tear that down; why not get a brush like we have done in times past on lots of jobs—just like painting it on." Brace said, "No, you can't do it,

it has to be taken down—you can't rub it under the bottom," and Blankenship then did it the way Brace told him and under Brace's direction.

On another occasion, some of the men on the job were working on a little front porch, and some were working on the back, and Brace came along and said: "Put the rest of these men on that front, and get that front done today; I want to commence with the brick tomorrow." Brace wanted to get the porch done that evening, so the brick men could commence at that particular place the next day. It was not necessary in this instance for Blankenship to take his men from one part of the job and put them on the other in order to get it ready more quickly for the bricklayers, because they might have been started at any other place on the house; but Brace insisted on starting them where the chimney was going to be built, which was right where the little porch was.

The next day Brace came out to the house and found that the carpenters had left an overhang on the porch that was about six inches too far out, and were in the act of sawing it off; Brace came up and seemed pretty sore and said to Blankenship that, if he had done what Brace had told him, it would have been all right. When Brace saw that Blankenship had lost some time because of getting this wrong and was delaying the bricklayers, he reprimanded Blankenship.

In another part of the house Brace had some shiplap left off in one of the closets, right off the left of another vacant place where the stove or ice box was supposed to set. This was done without Blankenship knowing anything about it, and when he inquired about it he was told that Brace had said to leave it off, that he wanted to make a little cupboard over this vacancy; Miller, Brace's assistant, came out there and Blankenship tried to get him not to build it that way, but Miller made Blankenship do it just like he wanted it. This particular detail was not shown on the plans.

On another occasion, Brace instructed Blankenship how the shiplap should be nailed on the house. A boy who was doing it would saw off several pieces of shiplap at a time, and put up one with a couple of nails in it, and then nail all of them at one time, but Brace required that each plank be nailed up solid before another was put up; Blankenship told him he would nail it like Brace said, because he was working for Brace and naturally had to do work like he wanted it.

On another occasion Brace got after Blankenship about working longer hours.

When the house was about to be finished, Brace came out and told the men that the house had to have weather strips. The plans they had did not call for weather strips. Brace did not have the weather strips then, and after that he called them at home and told them to come out and put them up; they went out and Brace showed them how the weather strips went, and directed the details of putting them on. Blankenship did not know how Brace wanted them put on, and Brace told him.

The witness Tedford testified that Brace gave the carpenters instructions on how to nail the lumber, how many nails to put in, about hurrying up, and made them change from one place to another. He further testified that Mr. Brace was supposed to be the plans and specifications for these jobs, and was supposed to tell the carpenters what to do.

Tedford further testified that on another occasion Blankenship started to order the flooring, and spoke to Brace about it; Brace said he did not want to put it in yet—to leave it off until he got ready, and that Blankenship told Brace he wanted the flooring right away, and Brace said that he was not ready for the flooring.

On direct examination Brace testified as follows:

"Q. Do you recall the occasion of Mr. Blankenship getting hurt out there? A. Yes, sir.

"Q. What was he doing with the Crain Ready-Cut House Company at that time? A. He had a contract for the carpenter-labor on the job.

"Q. Will you please relate to the jury the circumstances leading up to that contract? A. The contract was oral.

"Q. Made between you and him? A. Yes.

"Q. Mr. Morris: May I ask, was that contract oral or in writing? A. The contract was oral.

"Q. Made between you and him? A. Yes.

"Q. Mr. Butts: You simply hired him? A. Yes."

On cross-examination the witness Brace testified that he reserved the right to control the details of the job on which Blankership was working wherever it was necessary.

(2) Neither do appellant's other assignments appear to point out reversible error; wherefore the learned trial court's judgment should have been affirmed; this protest against the refusal here of that order is respectfully entered.