JOHNSON et al. v. ROYAL INDEM-NITY CO.

No. 14289.

United States Court of Appeals Fifth Circuit.

July 10, 1953.

Edward M. Carmouche, William F. Wilson, Jr., Carmouche, Martin & Wilson, and Nathan A. Cormie, Lake Charles, La., for appellants.

John L. Pitts and Stafford & Pitts, Alexandria, La., for appellee.

Before HOLMES, BORAH, and RUS-SELL, Circuit Judges.

BORAH, Circuit Judge.

This is an appeal in an action brought by appellants, Seaborn Johnson, on behalf of himself and his minor son Roger Dale Johnson, and Gertrude Johnson, the wife of Seaborn Johnson, against the Royal Indemnity Company, the public liability in-

surer of W. R. Core, to recover damages for injuries to persons and property resulting from a collision on Louisiana Highway No. 22 between a Chevrolet passenger automobile which was being driven by Seaborn Johnson and a Dodge dump truck, driven by Kenneth James.

In their complaint the plaintiffs-appellants alleged that the injuries sustained were caused by the negligence of the driver of the dump truck, Kenneth James, and its owner, Pete James; that the defendant Royal Indemnity Company had in effect at the time of the accident a public liability insurance policy in favor of W. R. Core on any truck that he might hire; and that Core hired the dump truck. The complaint also alleged that the "policy was in effect and in favor of the driver, Kenneth James, the owner, Pete James, and the employer, W. R. Core;" and that under the terms of the policy the defendant was obligated to pay all sums which the insureds might become obligated to pay as damages by reason of personal injury resulting from operation of the vehicle. In its answer, after raising the usual defenses of contributory negligence and lack of negligence on the part of the driver of the truck, the defendant denied that Core was the employer of Pete James and averred that at the time of the accident the truck was not engaged in any business for Core, and therefore, Core's insurer was not liable under the policy.

The case came on for trial before a jury and at the close of all the evidence defendant moved for a directed verdict. Reserving decision on the legal questions raised by the motion, the trial judge submitted the case to the jury, which returned a verdict in favor of the plaintiffs. Thereafter, defendant moved to have the verdict set aside and to have judgment entered in its favor and in support thereof urged two grounds: First, that the evidence showed conclusively that the owner of the truck, Pete James, was an independent contractor and Core and his insurer were not responsible for the negligent acts of James' employees; and second, that even if Pete James should be considered not an independent contractor, the driver of the truck was not about any business for Core at the time of the accident. After a careful review of the facts in the case and the applicable law, the trial judge granted the motion and entered a judgment in favor of the defendant notwithstanding the verdict of the jury. This appeal followed.

The controlling question here presented is whether the court below erred in entering judgment to the effect that at the time of the accident the driver of the truck, Kenneth James, was an employee of Pete James and was not an employee of Core.[1] The answer to that question largely turns on whether Pete James was an independent contractor or an employee of Core under Louisiana law.

The testimony discloses that Core contracted with the State of Louisiana to furnish pit run gravel delivered at road sites at a certain price per yard. In turn, Core

---

1. The public liability insurance contract between W. R. Core and defendant provided in paragraph III under the heading "Definition of Insured", the following:

"With respect to the insurance for bodily injury liability and for property damage liability the unqualified word 'insured' includes the named insured and also includes any person while using the automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission. * * * "

This policy contained a hired car endorsement, which provided in part as follows:

"It is agreed that such insurance * * * applies with respect to hired automobiles, subject to the following provisions:

"1. *Definitions*: The words 'hired automobile' shall mean a land motor vehicle, trailer or semitrailer used under contract in behalf of, or loaned to, the named insured * * *. The word 'automobile' whenever used in the policy, with respect to the insurance afforded under this endorsement, shall include 'hired automobile.'

"2. *Application of Insurance.* (a) The Definition of Insured Agreement of the policy applies to the insurance afforded under this endorsement *except to the owner of the automobile or any employee of such owner.*" (Emphasis added.)

had an understanding or agreement with various truckers whereby they hauled the gravel from the pit and dumped it at the road sites designated by the State. This arrangement with the truckers was of a haphazard nature. There was no agreement with any of the truck owners to haul a specified amount of gravel or to do a stipulated portion of work. As a result, the truckers hauled gravel whenever there was work available and they felt inclined to so occupy themselves and their equipment. Accordingly, some days there would be ten trucks hauling gravel from Core's pit to the road sites and at other times there might be as many as forty. The truck owners furnished their own gas and oil, and otherwise maintained their vehicles. Core did not require that the trucks be of any particular size, nor did he require that a truck haul a certain number of loads per day. For that matter, a trucker could leave the job in the middle of the day if he so desired. When a driver delivered a load of gravel to the road site, an inspector for the State would show him where to dump the load and a boy employed by the State would trip the hatch and dump the truck. The inspector would then give the driver a receipt showing the number of yards of gravel hauled. The drivers in turn, handed such receipts to the various truck owners, who presented them to Core and received payment therefor at the rate of $1.25 per yard for the first four miles hauled and $1.00 per yard for each succeeding four miles.

The truck drivers were selected for employment and paid by the various truck owners. Accordingly, the compensation paid to truck drivers was not uniform. Pete James paid driver Willie Fee at the rate of 25 cents on each dollar earned by the truck which Fee drove, whereas, Gordon Deason paid his drivers at the rate of $7.00 per day. Core had nothing to do with hiring the various truck drivers and testified that he had no authority to fire a driver. However, he did venture to say that if one of the drivers had driven so recklessly as to threaten to cause injury or

death to another, he would have prevented such driver from hauling on the job by instructing his dragline operator not to load the vehicle.

We consider next the working relationship between the truck drivers and Core's dragline operator and oiler. The evidence shows that when the drivers first started hauling from the gravel pit the dragline operator told them where to deliver the loads. As for the actual loading, Core's employees frequently would instruct a driver to move a few feet forward or back to facilitate matters and the drivers always complied. Apparently there was no fixed time to commence operations and the drivers would inquire at the gravel pit whether there would be any hauling to be done and what time it would commence. As the working day drew to a close, the drivers generally asked the oiler or dragline operator whether there would be time for another load. On other occasions the dragline operator gave advance notice that he would not load trucks after a certain time. However, on the day of the accident the gravel inspector, an employee of the State of Louisiana, was the one who told the drivers to cease work at noon.

From the nature of the operations the truck owners exercised but little direct supervision over their drivers. However, the evidence affirmatively shows that Pete James did exercise control over his drivers when he was around.

The courts of Louisiana and this court have had occasion to consider factual situations which are indistinguishable in any material respect from those here presented.[2] In Alexander v. Frost Lumber Industries, D.C., 88 F.Supp. 516, Frost Lumber Industries entered into a contract with truck owner Herman Jones to haul logs of a certain size to Frost's mill at Mansfield, Louisiana. As in the instant case, Jones furnished his own equipment, labor, gas and oil, and maintained his trucks. Also, he was paid on the basis of a fixed price per thousand feet of logs delivered at the mill. Moreover, Jones

**2.** Alexander v. Frost Lumber Industries, D.C., 88 F.Supp. 516, affirmed 5 Cir., 187    F.2d 27 and Eames v. Alexandria Contracting Co., La.App., 154 So. 510.

564

was not the only trucker on the job, as Frost Lumber Industries hired other trucks in a similar manner. During the course of operations one of Jones' drivers committed a tort. An action for damages was brought against Frost Lumber Industries and on defendant's motion for summary judgment the District Judge held that the driver was an employee of Jones and that Jones was an independent contractor. In the course of his opinion the District Judge said [88 F.Supp. 517]:

"The Louisiana courts have repeatedly held that a person who engages * * * to haul logs at so much per thousand feet delivered * * * and who furnishes and maintains his own hauling equipment and employs his own help, without control and direction by the owner of the logs, other than such general supervision as may be required to see that the work is performed in compliance with the contract, is an 'independent contractor', and is alone liable for his own acts of negligence, or those of his employees, in performance of such work."

On appeal, this court adopted the District Judge's opinion as its own. Alexander v. Frost Lumber Industries, 5 Cir., 187 F.2d 27.

■ The Frost Lumber case involved the hauling of logs; Pete James' trucks hauled gravel. Appellants do not claim that this distinction is material but seek to avoid the impact of that decision by pointing out that there Herman Jones had absolute control over his trucks at all times and Frost Lumber was only interested in the final result; and it is argued that neither of those factors is present in the instant case. We think otherwise. There is nothing whatever to suggest that Pete James did not retain the absolute right to control his trucks and their drivers at all times. There is no requirement in the law of Louisiana that a master must at all times accompany servants preforming a commonplace, routine function, such as truck driving, in order to maintain the master-servant relationship. The common practice is to the contrary. It is true that

Core's employees sometimes directed a driver to back up or go forward a few feet in order to facilitate loading, or indicated to the truck drivers that they would commence loading at a certain time or cease to load at a specified hour; and that Core testified that if one of the drivers had been reckless he would have instructed the dragline operator not to load his truck. But these facts only indicate necessary cooperation and a rightful regard for the rights of others. They are entirely insignificant and this measure of control does not establish the relation of master and servant between Core and the truck drivers. As to the further contention we deem it sufficient to say that the haphazard nature of the arrangement between Core and the truckers presents as clear a case of being interested only in the results as one could imagine. The courts have repeatedly held that an employer has a right to exercise such control over an independent contractor as is necessary to secure the performance of the contract according to its terms in order to accomplish the results contemplated by the parties in making the contract, without thereby creating such contractor an employee. Casement v. Brown, 148 U. S. 615, 622, 13 S.Ct. 672, 37 L.Ed. 582; cf. National Labor Relations Board v. Steinberg, 5 Cir., 182 F.2d 850, 856.

■ Appellants further contend that even if Kenneth James was the general employee of Pete James, he was the borrowed servant of Core. In determining whether an employee becomes the servant of another so as to impose liability on such third person for torts committed by the employee, the Louisiana courts have followed the familiar "control test". Dixie Machine, Welding & Metal Works v. Boulet Transp. Co., La.App., 38 So.2d 546, 551. See The Borrowed Servant Problem, 38 Mich. Law Rev. 1222; The American Law Institute's Restatement of Agency, § 227. On this point, suffice it to say there is nothing in the evidence to suggest that Pete James so relinquished the right to control Kenneth James in the performance of the work as to cause the latter to become the borrowed servant of Core.

For the reasons stated, we conclude that Pete James, the owner of the truck, was an independent contractor and Kenneth James was his employee. It follows that under the terms of the hired car endorsement appellee was not responsible for any torts committed by Kenneth James or Pete James, and the court below did not err in rendering judgment in favor of the defendant notwithstanding the verdict of the jury. Our decision on this issue makes it unnecessary to consider the further legal defense urged in support of the trial judge's decision.

The judgment was right and it is

Affirmed.