Lilly, Adm'x *v.* J. A. Riggs Tractor Co.

5-3453                                                386 S. W. 2d 488

Opinion delivered February 8, 1965.

*Mann & McCulloch, Montedonico, Boone & Gilliland, Heiskell & Loch, Memphis, Tenn.,* for appellant.

*W. H. Dillahunty, Hale & Fogleman, E. J. Butler,* for appellee.

Carleton Harris, Chief Justice. On July 7, 1962, Roy Lilly was killed while working for K. S. Reece Construction Company. His death occurred while Lilly and others were endeavoring to repair a broken cable on certain earth-moving equipment, *viz,* a Caterpillar machine (Cat 619C). Lilly's widow, individually, and as administratrix of the estate, instituted suit in the St. Francis Circuit Court against the J. A. Riggs Tractor Company, appellee herein, an authorized dealer for Caterpillar Tractor Company, alleging that appellee company had entered into negotiations with Reece Construction Company for the sale of the Cat 619C; that the machine was delivered to the job site, and put into use by the Reece Company, Lilly being one of the employees desig-

nated by Reece to operate the equipment; that Lilly was permitted "to begin the operation of the equipment without warning as to its dangerous propensities. No warning was given of the fact that it would be highly dangerous to get close to, or to climb upon the equipment, if the main cable on the equipment should break and become snarled. No instructions or warnings were given to Plaintiff's Deceased as to the proper and safe manner for unsnarling said cable in event it should break and become snarled. The failing to give said instructions and warnings constitutes negligence on the part of the agents and employees of Defendant, who were at the time acting within the scope of their employment for Defendant." It was further alleged that Lilly's death was a proximate result of the aforesaid negligence, and total damages were sought in the amount of $203,201.48. The Riggs Tractor Company answered, denying negligence, and further asserting that Lilly's death was due to his own negligence, and that of his fellow workmen. The case proceeded to trial, and at the conclusion of appellant's evidence, appellee moved for an instructed verdict. This motion was granted, and judgment was entered in accordance therewith. From such judgment comes this appeal.

Only one point is raised for reversal, it being urged that the court erred in directing a verdict for appellee at the close of appellant's case. It might also be stated here that only one act of negligence is alleged, *viz*, the allegation heretofore set out verbatim from appellant's complaint. Accordingly, in determining the litigation, there is really only one question, which we are called upon to answer. Did the failure of appellee to give instructions or warnings relative to the proper and safe manner for unsnarling a cable (in event it should break and become snarled) constitute actionable negligence? Of course, if the answer to this question is "Yes," it is also necessary that appellant establish that such negligence as the proximate cause of Lilly's death. However, under our finding, as hereinafter set out, we do not reach that question.

At the outset, it might be well to describe the function and manner of operation of the Cat 619C, as same appears from the evidence offered.[1] The Caterpillar machine, here under discussion, is a large earth-moving machine, weighing approximately one hundred thousand pounds, and capable of moving eighteen yards of earth at one load. In the process of loading, the pan part of the machine is lowered, and with the assistance of a tractor pushing at the rear of the machine, the dirt is scraped up by the pan, and is thus loaded. In unloading, an ejector is pulled forward by a metal cable, thereby pushing the dirt out of the machine. The ejector is returned to its original position through the use of large springs. The fatal injury to Lilly occurred under the following circumstances. According to the testimony of K. S. Reece, Lilly was operating the machine on July 7, 1962. A cable on the Caterpillar was broken during operation, and Lilly drove the scraper to the shop. Reece went to the shop, and Joe Gordon, a worker there, was also present. Lilly and Gordon had pulled off all of the cable except a piece about fifteen feet long,[2] which was hung in the machine. The Caterpillar was backed up to a tree, and the cable was hooked to the tree. Reece, Lilly, and an employee of Gulf Oil Company, who had gone to the shop to deliver fuel, then endeavored to pull the ejector back, but were unable to do so. Reece testified that prior to making any effort to free the cable, he (Reece) told Lilly twice that they should get a serviceman from the Riggs Tractor Company to "lace" the cable, but that Lilly stated, "I can lace it myself, but we have got to pull this ejector back."

After failing to pull the cable loose, it was decided to cut it. According to Joe Gordon, Lilly said:

"Unconnect that cable and we will study some way to get that piece of cable out back there."

---

[1] Pictures of a Caterpillar are in the record, but none of the parts are marked or labeled, making it somewhat difficult to visualize or properly describe the operation of the machine. Some witnesses also refer to the Caterpillar as a scraper.

[2] According to Reece, it takes about two hundred and eight-five feet of cable for the machine.

Gordon continued, "About then we got to twisting it and we got a crow bar and tried to drive it out and we couldn't get it to come loose and me and the fuel man got to twisting on it." Again, referring to Lilly, "Then he said, 'Go to the shop and get a cold chisel and some pliars and hammer and we will cut it,' and I hit it a couple or three licks and it come back and it throwed me ten or twelve feet."

According to Reece, Gordon was standing on the "slide bar" of the machine; Reece was standing behind the right rear tire; the Gulf employee was apparently also standing behind the right rear tire (this is not clear from the record), and Lilly was standing about three feet from him, toward the front of the machine; all were within a five-foot circle, and could have touched each other. When the last strand was cut, the ejector sharply returned to its proper position, striking Lilly, who had evidently moved onto the machine. The witnesses could see his legs protruding from between the ejector blade and the frame of the scraper — as stated by Joe Gordon, "Right down in the pan, the front of the pan comes back to the other, that is where he was, down in there."

Appellant asserts that the Caterpillar was inherently dangerous, but we do not agree. Black's Law Dictionary, Fourth Edition, Page 921, defines "inherently dangerous" as "danger inhering in instrumentality or condition itself at all times, so as to require special precautions to prevent injury, not danger arising from mere casual or collateral negligence of others with respect thereto under particular circumstances." Of course, no citation of authority is necessary to support the statement that the mere fact that one is injured by a machine, or instrument, does not mean that the machine or instrument is inherently dangerous. It has been said that a product is inherently dangerous where the danger of injury stems from the nature of the product itself. An automobile, driven at a high rate of speed—or without proper brakes—or, if at night, without headlights—or if operated by one who is intoxicated—can certainly become

a highly dangerous instrument, capable of causing death and crippling injuries. Yet, there is general agreement among the jurisdictions that motor vehicles are not inherently dangerous (Annot. 74 A.L.R. 2d 1111). Numerous articles or substances, which have been held not to be inherently dangerous within the meaning of the rule, include an electric body-vibrating machine, an electric stove, a chain, a haybaler, a flat iron, a gas stove, a porch swing, a sofa, a refrigerator, and others too numerous to mention. See *Defore* v. *Bourjois, Inc.*, 105 So. 2d 846. Still, all of the articles or instruments named can, by particular use, cause death or severe injury. In fact, as this court stated in *Reynolds* v. *Manley*, 223 Ark. 314, 265 S. W. 2d 714, "It is possible to use most anything in a way that will make it dangerous." Of course, certain substances or articles are inherently dangerous, such as dynamite, nitroglycerin or other explosives, poisons, and many others. In the case before us, we are definitely of the opinion that the Caterpillar itself was not inherently dangerous; it was *the manner of repairing* that created the danger, *i.e.*, it was the fact that the cable was deliberately cut, causing the spring to pull the ejector sharply back, that caused Lilly's death, rather than the fact that the Caterpillar was equipped with a cable and spring.

As previously stated, appellant's sole contention of negligence on the part of appellee company was that the latter did not sufficiently explain proper operation of the machine; actually, this simply means that appellee did not explain that if a cable should break and become snarled, it should not be cut, for this act would cause the ejector to spring back to its original position.

We have concluded that there was insufficient evidence on the issue of negligence to make a jury question. It has already been said that the machine was not inherently dangerous, and there is no evidence that death or injury had previously occurred to any other person because of the "snarling" of the cable on the caterpillar, so as to put appellee on notice of a possible hazard; in

fact, there is no evidence that a cable had ever become "snarled."

James Reece, son of K. S. Reece, was Safety Personnel Officer on this particular job, and he testified that safety meetings were held once a week. Reece stated that no one from the Riggs Company told him how to operate the machine (and apparently he did not ask), but that he did not feel that he needed anyone to teach him how to operate it. Appellant points out that previous to obtaining the Caterpillar, the Reece Company had used machines with hydraulic equipment instead of cable equipment, and this is the principal reason that appellant asserts a duty on the part of appellee to explicate the operation. Reece explained as follows:

"On both machines, insofar as the cable and hydraulic are concerned, they perform three actions, one is to raise and lower the scraper, one is to pull the ejector forward to push the dirt out, there is an apron in front that holds the dirt in, it raises and lowers the apron. On this particular piece of equipment all three of those were done by cable. On the Euclid equipment it is done by hydraulic cylinders. * * * They [hydraulic cylinders] have three control levers at your right hand that are connected with the hydraulic hose with the cylinders, it has a place for hydraulic oil that goes from the valve on the front to the cylinders."

Reece testified that he, though never hauling a load of dirt with the 619C, drove the machine for a while, experimenting with it. He explained the procedure of bringing the ejector forward and returning it to its original position. He stated that in handling the lever, which controlled the ejector, a sudden move could not be made, but that rather it was a "feeling process." "I turned it loose too quick one time, and it went back and almost knocked the backend out." It appears, therefore, that, though Reece received no instructions from Riggs, he was familiar with the difference in operating cable equipment and hydraulic epuipment.

K. S. Reece was also familiar with the difference in operating by cable and operating hydraulically, and he testified that Lilly that he had operated this type of machinery.[3] Reece said that the day before Lilly's death, he (Reece) had called Lilly's attention to the manner in which the ejector returned when released, "Yes, sir, I told Roy, I said, 'Let that thing back a little easier, its going to knock the whole backend out.' "

Very pertinent to this litigation was the testimony of the elder Reece, relative to what happened only a short time before Lilly's death. The four men (Reece, Lilly, Gordon and the Gulf Oil man) were discussing how to pull the cable free, and Lilly (according to Reece) said, "I have never saw a cable break like this before." Reece replied, "I don't know anything about this machine, let's drive it out here and let's call a serviceman from Riggs to lace it." Lilly then stated, "I can lace it myself but we have got to pull this ejector back." Reece, as earlier mentioned, testified that he suggested twice that a serviceman from the tractor company be called, but Lilly reiterated that he could do the job himself. It thus appears that Lilly voluntarily insisted on doing the repair work, even though Reece twice suggested that they should call a serviceman from the Riggs Company.

There was no error in directing a verdict for appellee.

Affirmed.

[3] The court excluded this testimony.